United States Court of Appeals,

Fifth Circuit.

No. 94-20137.

LAFARGE CORPORATION, et al., Plaintiffs,

Lafarge Corporation, Plaintiff-Appellee, Cross-Appellant,

v.

HARTFORD CASUALTY INSURANCE CO., Defendant-Appellant, Cross-Appellee.

HARTFORD CASUALTY INSURANCE CO., Plaintiff-Appellant, Cross-Appellee,

v.

LAFARGE CORPORATION, Defendant-Appellee, Cross-Appellant.

Aug. 21, 1995.

Appeals from the United States District Court for the Southern District of Texas.

Before KING, GARWOOD and BENAVIDES, Circuit Judges.

GARWOOD, Circuit Judge:

Plaintiff-appellant Hartford Casualty Insurance Co. (Hartford) appeals the district court's judgment that Hartford had a duty to defend its insured, defendant-appellee Lafarge Corporation (Lafarge), in the underlying litigation and ordering Hartford to pay an apportioned amount of Lafarge's defense costs, as well as Lafarge's attorneys' fees and prejudgment interest. Lafarge cross-appeals, claiming that the district court erred in apportioning Hartford's share of defense costs and in awarding Hartford summary judgment on Lafarge's Texas Insurance Code claims. We affirm in part, reverse in part, and remand.

**Facts and Proceedings Below**

The present controversy arises out of a suit filed against Lafarge and various other defendants by All American Pipeline Company (All American). All American contracted with American West Pipeline Constructors (American West) for the construction of a pipeline to run from Santa Barbara, California, to McCamey, Texas. American West subcontracted Leonard Pipeline-Anchor Wate (LAC) to provide a special coating to protect the pipeline, which was to be buried, from the elements. LAC is a joint venture; one of the joint venturers, Anchor Wate, is a wholly-owned subsidiary of Lafarge.

Sometime around February 1988, All American discovered that the protective coating supplied by LAC had failed at the field joints, damaging the pipeline. In August 1988, it sued, among others, LAC, and Anchor Wate individually, for breach of contract, breach of warranty, strict products liability, negligence, and misrepresentation. All American also named Lafarge as a defendant on the basis of a surety promise allegedly made by Lafarge on behalf of LAC and its individual corporate venturers. In September 1989, All American amended its petition to add a claim against Lafarge for its own negligence. In the amended petition, All American also alleged that Anchor Wate was the alter ego of Lafarge and that Lafarge was thereby liable for Anchor Wate's alleged negligence.

Hartford was Lafarge's comprehensive general liability insurer from April 1, 1987, to April 1, 1988. Lafarge tendered the original petition to Hartford for defense on January 18, 1989.

2

Although Hartford initially acknowledged that the claims against Lafarge *might* be covered under the policy, it ultimately denied coverage. In response to Lafarge's notice that it intended to sue, as required under the Texas Insurance Code, Hartford asserted that it would reimburse only those defense costs incurred after August 13, 1990, the date on which Hartford first received All American's amended petition. On February 12, 1991, Hartford filed a declaratory judgment action against Lafarge and Anchor Wate in federal district court in Virginia. On March 28, 1991, Lafarge filed a breach of contract and declaratory judgment suit against Hartford in Texas state court. Hartford removed the suit to the district court below, where it was consolidated with the Virginia action.

On May 17, 1991, Lafarge moved for partial summary judgment on its breach of contract claims. Hartford filed a cross-motion for summary judgment on the duty to defend and coverage issues, as well as a motion for summary judgment on Lafarge's Texas Insurance Code claims. By order of December 7, 1991, the district court granted Lafarge's motion in part, finding that Hartford did have a duty to defend under both the original and amended petitions. However, the district court determined that, because the injury to the pipeline was a continuing one and Hartford had provided coverage for only a part of the period during which the injury accumulated,[1] its

_____

[1]The district court found that the alleged injury began on April 17, 1985 (the date the pipeline was placed in the ground) and continued until the filing of All American's original petition on August 8, 1988. Although the district court invited the parties to present evidence of contrary dates, and noted in

3

liability should be prorated to reflect its proportionate "time on the risk."  It therefore held Hartford liable for 30% of Lafarge's past and future defense costs.[2]  In addition, the district court granted Hartford's cross-motion in part by dismissing Lafarge's Texas Insurance Code claims;  the district court determined that, although ultimately wrong in its determination, Hartford had a reasonable basis for contesting its duty to defend and that it had acted reasonably in investigating and responding to the underlying claims.  Finally, it found that Hartford's motion for summary judgment on the coverage issues was premature because the underlying litigation had not yet been resolved.

Hartford then moved for clarification, and Lafarge for reconsideration, of certain issues addressed in the December 7 order.  The district court reaffirmed its order, but added that, because Hartford's liability for defense costs had been apportioned, Lafarge's deductible under the policy should also be apportioned.  It found that the policy was silent as to what should occur if, as here, Hartford was required to pay only a percentage of the defense costs, and therefore correspondingly reduced

_____

its order of February 3, 1992, that Lafarge had presented a "Petition for Correction of Dates of Property Damage," the district court did not specifically address this motion and ultimately again ordered the parties to submit further evidence of the date damage to the pipeline began.  In any event, the parties do not question on appeal the district court's fixing of these dates.

[2]By agreement of the parties, this percentage was subsequently amended to 33.9%.

4

Lafarge's deductible by 30%.[3]

After the underlying litigation with All American settled, Lafarge filed a motion for entry of an award of money damages, pre- and post-judgment interest, and attorneys' fees. Hartford filed objections.[4] The district court found that Lafarge was entitled to an amount equal to 33.9% of its total defense costs, less 33.9% of the $250,000 policy deductible. It also awarded prejudgment interest on that sum at a rate of 10%.[5] Lastly, the district court, having undertaken a lengthy survey of applicable Texas law, determined that Lafarge was entitled to an award of reasonable attorneys' fees under Tex.Civ.Prac. & Rem.Code § 38.001(8). By its final judgment of January 28, 1994, the district court awarded Lafarge

1) defense expenses in the amount of $457,089.05;

---

[3]The parties later agreed that the applicable percentage was 33.9%.

[4]In addition, Hartford filed a motion for summary judgment on Lafarge's claim for breach of the insurer's duty of good faith and fair dealing. The district court granted this motion, finding that the portion of its December 7, 1991, order relating to Lafarge's Texas Insurance Code claims negated the "reasonable basis" element of the common law bad faith claim and that Lafarge had failed in the intervening year to come forward with any additional summary judgment evidence to undermine that earlier determination. Lafarge does not challenge this aspect of the court's judgment on appeal.

[5]Because it determined that the amount of attorneys' fees owed under the insurance contract was not ascertainable from the face of the document, the district court held that the Texas prejudgment interest statute did not apply to the case and that therefore it was not bound to apply the 6% interest rate prescribed by the statute. It therefore made an "equitable award" of prejudgment interest at the rate prescribed by Tex.Rev.Civ.Stat.Ann. art. 5069-1.05 § 2. *See* Part V, *infra.*

5

2) $138,183.61 in prejudgment interest;

3) $198,000 in attorneys' fees;

4) post-judgment interest at a rate of 3.67% (as specified in 28 U.S.C. § 1961) on items 1 through 3 from the date of judgment until paid; and

5) additional attorneys' fees in the amount of $30,000 if Hartford pursues an unsuccessful appeal to this Court.

Hartford timely appealed to this Court; Lafarge timely cross-appealed.

## Discussion

I. Hartford's Duty to Defend

A. Policy exclusions.

Initially, Hartford argues that, under a variety of exclusions in Lafarge's insurance policy, Hartford had no duty to defend Lafarge in the underlying suit. In determining whether an insurer has a duty to defend its insured, Texas courts generally look only to the allegations of the plaintiff's complaint and the terms of the insurance contract. *American Alliance Insurance Co. v. Frito-Lay, Inc.,* 788 S.W.2d 152, 153-54 (Tex.App.—Dallas 1990, writ dismissed). Under this so-called "eight corners rule" or "complaint allegation rule," the allegations of the complaint are taken as true, and the duty to defend arises if the complaint thus construed asserts a claim facially within the coverage of the policy as reflected by its terms. *Gulf Chemical & Metallurgical Corp. v. Associated Metals & Minerals Corp.,* 1 F.3d 365, 369 (5th Cir.1993). Even if the plaintiff's complaint alleges multiple claims or claims in the alternative, some of which are covered under the policy and some of which are not, the duty to defend

6

arises if at least one of the claims in the complaint is facially within the policy's coverage. *Rhodes v. Chicago Insurance Co.,* 719 F.2d 116, 119 (5th Cir.1983). The duty to defend is thus broader than the duty to indemnify. *Gulf Chemical,* 1 F.3d at 369. Despite the breadth of this duty when applicable, however, "[a]n insurer is required to defend only those cases within the policy coverage.... If the petition only alleges facts excluded by the policy, the insurer is not required to defend." *Fidelity & Guaranty Insurance Underwriters, Inc. v. McManus,* 633 S.W.2d 787, 788 (Tex.1982) (citations omitted).

Applying these principles, we conclude that most of the exclusions on which Hartford relies in denying its duty to defend are clearly not applicable to the case at hand. We find merit, however, in Hartford's argument that the "incidental contract" provision precluded a duty to defend against All American's original petition, which only alleged a surety claim against Lafarge. We therefore conclude that Hartford had no duty to defend until the amended petition was tendered to it. We will address each of Hartford's arguments in turn.

Hartford first argues that, under the policy's "own products" exclusion, under which no coverage is provided for "property damage to the named insured's products arising out of such products or any part of such products," it is not required to defend Lafarge with respect to that portion of damages that represented the cost of replacing the coating, as opposed to the damages for the cost of replacing the pipeline itself. This argument is wholly without

7

merit. That Hartford may not ultimately be required to indemnify Lafarge for the replacement cost of the coating does not abrogate its duty to defend a covered cause of action in the first instance. The complaint clearly alleged that the defective coating caused damage to the pipeline; this was the damage (or part of the damage) for which recovery was sought.

Hartford next argues that the petition was ambiguous as to when the damage to the pipeline occurred and that therefore an exception to the eight corners rule should allow it to submit evidence that the damage actually occurred outside the coverage period.[6] *See Western Heritage Insurance Co. v. River Entertainment,* 998 F.2d 311, 313 (5th Cir.1993) ("[W]hen the petition does not contain sufficient facts to enable the court to determine if coverage exists, it is proper to look to extrinsic evidence in order to adequately address the issue."). Specifically, Hartford alleges that, as of the date the policy expired, All American had yet to identify any section of the pipeline that needed to be replaced.

Hartford's reliance on this narrow exception for truly ambiguous complaints is misplaced. The complaint is simply not as ambiguous as Hartford would have us believe. The petition alleges that the damage was discovered sometime in February 1988, during the period of Hartford's coverage. Regardless of when the damage

---

[6]We note too that, although the district court gave the parties ample opportunity to present evidence showing that the dates of damage were different from those it had found, neither party successfully pursued this challenge. *See* note 1, *supra.*

8

to the pipeline began, it was not a single event but a continuous process that occurred over an extended period of time. It is therefore reasonable to infer that, if as the complaint alleges, the damage was discovered in February 1988, then some part of it occurred during the period of Hartford's coverage.[7] Where an ambiguity exists, the eight corners rule requires the district court to give the petition the most liberal reading possible, resolving all legitimate doubts in favor of coverage. *Continental Savings Association v. U.S. Fidelity and Guaranty Co.,* 762 F.2d 1239, 1243, *amended in part,* 768 F.2d 89 (5th Cir.1985); *see also Cullen/Frost Bank of Dallas v. Commonwealth Lloyd's Insurance Co.,* 852 S.W.2d 252, 259 (Tex.App.—Dallas 1993, writ denied). Clearly, this is not a case in which it is "impossible to discern" whether coverage is potentially implicated.[8] *Western Heritage,* 998 F.2d at

---

[7]Hartford's supposition that the operative date is the date on which the pipeline had to be replaced is unsupported. The damage complained of was the corrosion of the pipeline, which necessitated replacement, not the replacement per se.

[8]The cases Hartford cites in support of its position are inapposite; they involve situations in which the complaint either omitted or indisputably misrepresented material facts that would have clearly excluded coverage. *See, e.g., Western Heritage,* 998 F.2d at 313 (noting that complaint specifically omitted reference to the fact that the third-party tortfeasor had been intoxicated when he left the insured's establishment, an obvious attempt to evade the clear exclusions of the policy); *McLaren v. Imperial Casualty and Indemnity Co.,* 767 F.Supp. 1364, 1374 (N.D.Tex.1991) (because insured's complaint did not state any covered claim, "even if McLaren's damage suit pleading could be read to allege facts that, if true, would cause coverage to exist, Imperial nevertheless would not have a duty to defend the suit because the facts alleged would be false"), *aff'd,* 961 F.2d 17 (5th Cir.1992), *cert. denied,* --- U.S. ----, 113 S.Ct. 1269, 122 L.Ed.2d 665 (1993); *State Farm Fire & Casualty Co. v. Wade,* 827 S.W.2d 448, 451 (Tex.App.—Corpus Christi 1992, writ denied) (in the absence of any allegation concerning how the boat that

315.

Hartford also contends that the alter ego claim of the amended petition was not covered because the policy excluded coverage for injuries arising out of uninsured joint ventures in which the insured participated. Because Anchor Wate's liability arose out of its participation in the joint venture, Hartford argues, it had no duty to defend against this claim. Hartford argues that, if the complaint is sufficient to allege a claim against Anchor Wate as a separate entity, Hartford was entitled to discovery to prove that, on the contrary, all the claims actually arose out of the conduct of the joint venture. This argument ignores that the amended complaint also alleged that Lafarge as a separate entity was itself guilty of negligence.[9] If the complaint contains both potentially covered and non-covered claims, the insurer must defend the entire suit. *Hartford Casualty Company v.*

---

was the subject of the policy was used, court could not determine, even "by reading the underlying petition broadly.... whether or not the personal boatowner's liability policy even possibly provides coverage"); *International Service Insurance Co. v. Boll,* 392 S.W.2d 158, 161 (Tex.Civ.App.—Houston 1965, writ ref'd n.r.e.) (*discussed in Gonzales v. American States Insurance Co. of Texas,* 628 S.W.2d 184, 186 (Tex.App.—Corpus Christi 1982, no writ)), (when policy contained an exclusion for "*any claim* arising from an accident while the insured vehicle was being driven by Roy Hamilton Boll," but did not disclose that Roy Hamilton Boll was the insured's son, and petition alleged only that the car was being driven by the insured's son, the insurer was permitted to introduce extrinsic evidence to show that the insured only had one son and that his name was Ray Hamilton Boll).

[9]Indeed, the ultimate judgment in the underlying suit was against Anchor Wate (as well as another Lafarge subsidiary) in its separate capacity for negligence and misrepresentations committed outside the joint venture.

*Cruse,* 938 F.2d 601, 603, 605 (5th Cir.1991). Because Lafarge was thus entitled to a defense in any event, further discovery on the joint venture issue would have been pointless with regard to Hartford's duty to defend.

Hartford, however, contends that it had no duty to defend Lafarge against the allegations of Lafarge's own negligence because there was no occurrence within the terms of the policy. Under the policy, an "occurrence" is defined as "an accident, including continuous or repeated exposure to conditions, which results in ... property damage neither expected nor intended from the standpoint of the insured." Hartford argues that the failure of a product to work does not constitute an accident. In addition, it contends that corrosion of the pipeline was not an accident because exposure to soil was contemplated.

Both these arguments are meritless. As discussed above, the complaint sought damages not simply because the coating failed but because the failure of the coating caused damage to the pipeline. As the district court correctly found, there is an accident or occurrence when the alleged product defect has caused damage to other property. *See, e.g., Cruse,* 938 F.2d at 604-05; *Travelers Insurance Co. v. Volentine,* 578 S.W.2d 501, 503 (Tex.Civ.App.—Texarkana 1979, no writ). Hartford's other argument—that no accident occurred because exposure to the soil was contemplated—is equally meritless. The very purpose of the coating was to protect the pipeline from exposure to the soil. The damage caused by the defective coating was an occurrence within the

11

meaning of the policy.

Lastly, Hartford argues that there is no coverage because the alleged surety agreement did not "relat[e] to the conduct of the named insured's business" as required by the policy's incidental contract provision.[10]  Here we agree with Hartford.  The policy afforded certain coverage "with respect to liability assumed under an *incidental contract* " and defined "*incidental contract* " as "any oral or written contract relating to the *conduct* of the *named insured* business."[11]  The original complaint alleged merely that

_____

[10]Alternatively, Hartford argues that the phrase "liability assumed by contract" in the provision refers only to situations where the insured is sued by the insured's promisee on the insured's agreement to indemnify or hold harmless the promisee from the promisee's tort liability to a third party or parties. However, Hartford points to nothing in the language or structure of the policy which indicates that the referenced provision is so restricted, and Hartford offers no authority (and points to no evidence) supporting its position in this respect.

[11]The base policy's definitions section included the following:

> "*incidental contract* means any written (1) lease of premises, (2) easement agreement, except in connection with construction or demolition operations on or adjacent to a railroad, (3) undertaking to indemnify a municipality required by municipal ordinance, except in connection with work for the municipality, (4) sidetrack agreement, or (5) *elevator* maintenance agreement;"

An endorsement respecting "contractual liability coverage," afforded certain coverage "with respect to liability assumed under an *incidental contract,*" and contained a provision that:  "The definition of *incidental contract* is extended to include any oral or written contract or agreement relating to the conduct of the named insured's business."

The base policy separately defined "insured" and "named insured," the latter as follows:  "*named insured* means the person or organization named in Item 1. of the declarations of this policy."  It is not contended that LaFarge

12

Lafarge represented that "the resources of Cement Lafarge were behind any project for which Anchor Wate contracted." It is clear from the context that the alleged guarantee was of Lafarge's ultimate financial responsibility. Lafarge has not argued, and we have found no record evidence to suggest, that Lafarge supplied or intended to supply materials, services, manpower, or anything else to the project, either directly or by supplying same to Anchor Wate or LAC, or was directly or indirectly involved in the project in any way apart from its mere ownership of Anchor Wate's stock. There is no evidence Lafarge did not conduct business of its own, separate from that of Anchor Wate or other subsidiaries. *See Sentry Insurance Co. v. R.J. Weber Co.,* 2 F.3d 554, 556 (5th Cir.1993) (under Texas law, burden is generally on insured to show that claim against it is potentially within coverage of policy).

However, Lafarge contends, and the district court found, that a contract that advances the interests of a subsidiary necessarily "relates to" the parent's economic well being. While that is true, it is not the same thing as "relates to the conduct of" the parent's business. Just as we may not simply assume that the subsidiary's business is the parent's business (many subsidiaries are in businesses requiring licenses that their parents do not have), so also we may not assume that conducting the subsidiary's business is conducting the parent's business.

---

subsidiaries generally, or Anchor Wate or LAC specifically, or indeed any entity other than LaFarge itself, was named or included in Item 1 of the policy declarations or was "the" (or a) "named insured" under the policy.

Lafarge reminds us of the Texas rule of insurance contract construction that, "when the language used is subject to two or more reasonable interpretations, the construction which affords coverage will be adopted. The policy of strict construction against the insurer is especially strong when the court is dealing with exceptions and words of limitation." *Blaylock v. American Guarantee Bank Liability Insurance Co.,* 632 S.W.2d 719, 721 (Tex.1982) (citations omitted). This rule assumes, of course, that the language of the policy requires interpretation; it is an equally well-settled rule of insurance law that terms in the contract that are unambiguous must be given their plain meaning. *Sekel v. Aetna Life Insurance Co.,* 704 F.2d 1335, 1338 (5th Cir.1983). The provision here requires *not* that the incidental contract sought to be covered relate to Lafarge, but that it "relat[e] to the *conduct* of the *named insured's* business." Lafarge has failed to show that the alleged guaranty related to the conduct of Lafarge's business. That it related to the conduct of the business of a Lafarge subsidiary does not of itself suffice. Anchor Wate was not a named insured in the policy, and Texas law generally recognizes the separate existence of parent and subsidiary corporations.

Moreover, even if we thought the language of the policy in some measure ambiguous, we are required to adopt Lafarge's interpretation of that language only if it is reasonable. We do not think Lafarge's suggested interpretation meets this standard because it would in effect read this part of the incidental

14

contract definition out of the policy altogether. *See Ideal Mutual Insurance Co. v. Last Days Evangelical Association,* 783 F.2d 1234, 1238 (5th Cir.1986) (an interpretation is not reasonable if it would strip the policy language of meaning). Under Lafarge's suggested interpretation, any contract that may in any way possibly benefit the named insured relates to *the conduct* of its business. Such an interpretation of this definition would render its "relating to the conduct of the named insured's business" language essentially meaningless. It would also serve as a practical matter to include all subsidiaries within the meaning of "the named insured" for these purposes, although the policy definition of "named insured" plainly does not include them, but includes only Lafarge itself. Such constructions are to be avoided. *Liberty Mutual Insurance Co. v. American Employers Insurance Co.,* 556 S.W.2d 242, 245 (Tex.1977).

We thus conclude that Hartford had no duty to defend with respect to the surety claim against Lafarge. As this was the only claim against Lafarge alleged in the original petition, Hartford could not have breached any duty to Lafarge by refusing to defend it against that claim:

> "[T]he duty to defend is determined by examining the latest, and only the latest, amended pleadings. A complaint which does not initially state a cause of action under the policy, and so does not create a duty to defend, may be amended so as to give rise to such a duty.... In [this] instance, the insurer may properly refuse to defend before the amended complaint is filed." *Rhodes,* 719 F.2d at 119.

*See also Steel Erection Co. v. Travelers Indemnity Co.,* 392 S.W.2d 713, 715-16 (Tex.Civ.App.—San Antonio 1965, writ ref'd n.r.e.)

15

(insurer liable only for that portion of defense costs incurred after plaintiff amended petition to state a covered claim).  As discussed above, however, the amended complaint, which included allegations of Lafarge's own negligence, did trigger a duty to defend.  *See Rhodes,* 719 F.2d at 119.  This duty Hartford acknowledged, subject to a reservation of its right to deny coverage for any claims it might determine to be outside the policy.  Such was its prerogative, as it was Lafarge's to refuse such a conditional tender of defense and proceed on its own.  *Id.* at 120.  In these circumstances, Hartford remains obligated for that portion of attorneys' fees incurred from the time the duty to defend arose, i.e., after the amended complaint was tendered to it.[12]  *See id.*  On remand, the district court should determine what portion of defense costs accrued after the date the amended petition was tendered to Hartford.

B. Failure to cooperate as excusing duty to defend.

Hartford further argues that, if it did have a duty to defend, as we have determined it did, then Lafarge's failure to cooperate with Hartford in attempting to determine if coverage existed excused Hartford from its duty to defend Lafarge.  We note first that, generally, "[c]ooperation clauses are intended to guarantee to insurers the right to prepare adequately their defenses on questions of substantive liability."  *Martin v. Travelers Indemnity Co.,* 450 F.2d 542, 553 (5th Cir.1971)

---

[12]As discussed below, Hartford cannot be held liable for pre-tender defense costs.  *See* Part II, *infra.*

(construing Mississippi law). Thus it is arguable that, with respect to the issue of coverage (a question of the scope of the policy), as opposed to the issue of liability (a question of whether Lafarge or Anchor Wate were ultimately guilty of negligence or some other culpable act), Hartford may not even invoke the cooperation clause here.

Nevertheless, even if the cooperation clause may be invoked with respect to coverage issues, we conclude that the district court did not err in determining that Lafarge did not breach that duty. In an effort to show Lafarge's lack of cooperation, Hartford directs us to a footnote in its cross-motion for summary judgment of June 13, 1991. The first of the four letters between counsel for the parties referenced in that footnote was dated February 11, 1991; Hartford filed a declaratory judgment action against Lafarge in federal court in Virginia on February 12, 1991. Although we have found no Texas cases directly on point,[13] we think it is clear that, once the insurer sues the insured and contests coverage, the insurer cannot rely on the cooperation clause to gain access to information that any other party to any other lawsuit would be

---

[13]This is probably so because cooperation clauses are generally for the benefit of insurers that undertake their insureds' defense and thereby align themselves with their insureds' interests. The case of *Allstate Insurance Co. v. Hunt,* 469 S.W.2d 151 (Tex.1971), illustrates this point. In *Hunt,* the Texas Supreme Court held that the insurer, having consented to the insured's proceeding with suit and having agreed to be bound by the outcome of that case, could not withdraw its consent and proceed on behalf of the uninsured motorist. *Id.* at 154-55. The court based its holding on the conflict of interest created by the insured's prior full cooperation, pursuant to the cooperation clause, with the insurer's investigation of the case. *Id.* at 152-53.

required to obtain through ordinary discovery methods.

II. Apportionment of Defense Costs

We have concluded that Hartford is liable for a portion (although a smaller portion than determined by the district court) of Lafarge's defense costs. Hartford argues that the district court erred in its determination of Hartford's liability for those costs. Specifically, Hartford contends that (1) it should not be held responsible for a percentage of all defense costs, but rather for only those costs attributable to covered claims, (2) it is not responsible for costs incurred on behalf of non-insured co-defendants in the underlying suit, and (3) it is not liable for defense costs incurred prior to Lafarge's tender of the amended petition to Hartford.

Hartford first claims that, despite the general rule that an insurer who has a duty to defend as to one claim must defend as to all claims, it should have been allowed to apportion defense costs between covered and non-covered claims. It is true that, when there is a clear distinction between covered and non-covered claims, an insurer may apportion defense costs. *EEOC v. Southern Publishing Co.,* 894 F.2d 785, 791 (5th Cir.1990). However, even though some of the claims were not covered under the policy, apportionment of costs would be not be feasible in this case because the claims all arose from a single accident. *See Insurance Company of North America v. Forty-Eight Insulations,* 633 F.2d 1212, 1224 (6th Cir.1980), *clarified,* 657 F.2d 814 (6th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981).

18

Hartford claims, however, that it should have been allowed further discovery to support such an apportionment between covered and non-covered claims. Similarly, Hartford argues that discovery was wrongfully denied with respect to its claim that it should not be responsible for defense costs incurred on behalf of the seven non-insured co-defendants in the underlying litigation. Although Hartford does not specify how further discovery would assist it in making the proposed allocation, we take it to be arguing that the district court should have allowed it to discover Lafarge's counsels' itemized bills and time records. We will thus examine these two claims together.

Our review of the record shows the following series of events. By its order of December 7, 1991, the district court granted Lafarge's motion for partial summary judgment and ordered the parties to conduct further discovery on the amount of defense costs in the underlying litigation. On February 4, 1992, in response to Hartford's motion for clarification of the December 7 order, the district court noted that it

> "intentionally did not rule on Hartford's argument that it should not be responsible for the defense costs incurred by Lafarge's counsel with regard to uninsured corporations. If, during the damages stage of *this* litigation, Hartford is able to convince the Court that *specific* expenses were incurred by Lafarge's counsel *solely* for the defense of uninsured corporations, the Court *may* deduct those expenses from the final total of defense costs."

In an effort to produce such evidence, on March 26, 1992, Hartford took the deposition of Eugene W. "Chip" Brees (Brees), the attorney who represented Canada Cement Lafarge and Lafarge Corporation, both

19

Hartford insureds, in the underlying litigation.[14]  With respect to each expenditure,[15] Brees averred that the same costs would have been incurred regardless of the participation of non-insured corporations.  In its final motion asking the district court to set the amount of damages, Lafarge asserted that none of the defense costs were attributable solely to the defense of non-insureds and that all the costs would have been incurred had Lafarge been the only defendant in the underlying suit.  Attached affidavits supported this assertion.

On April 3, 1992, Lafarge moved for the entry of an award in the case.  In its objections to that motion, filed April 23, Hartford complained that, because of Lafarge's failure to produce itemized bills, it could not determine whether it was "being asked to pay for the cost of Lafarge evaluating coverage under other insurance policies or the costs of negotiating Lafarge's settlement with Nationwide [another Lafarge insurer]."  Hartford did not argue, however, that it should be allowed to discover the bills in order to parse covered and non-covered claims in the pipeline litigation itself, nor did it argue that such discovery was needed to help it determine what portion of defense costs were attributable to the defense of non-insureds.  In its response to

---

[14]Other attorneys represented other various groups of defendants in the underlying litigation.

[15]Brees was questioned only about expenditures other than attorneys' fees as such;  for example, expert witness fees and materials preparation costs.

Hartford's supplemental response of January 26, 1993,[16] Lafarge stated that it was claiming attorney-client and work product privileges over the itemized bills and would only produce them for an *in camera* inspection by the district court.

Between the date of that response, February 4, 1993, and the date of the district court's final memorandum and order of January 5, 1994, the issue of production of itemized bills never surfaced again in the parties' numerous filings before the district court. So far as the record reveals, Hartford never filed a motion to compel production of the documents or submit them to an *in camera* review. Indeed, it was Hartford that first stepped forward, on November 8, 1993, and requested the entry of final judgment in this case.[17] During this entire period, Hartford never intimated to the district court that further discovery was required. The district court's memorandum and order granting Lafarge's motion for summary judgment did not address the issue of itemized bills, and although final judgment was entered on the basis of that memorandum and order, Hartford never filed a motion to reopen the evidence or reconsider this issue.

Given these circumstances, we must conclude that Hartford has waived whatever argument it had that the district court erred in not requiring Lafarge to produce more detailed billing statements.

[16]Hartford had made a general request for discovery of the itemized bills in this supplemental response.

[17]The record contains no formal motion by Hartford requesting the entry of final judgment. On November 29, 1993, however, Lafarge made a formal, written motion joining in Hartford's earlier request for final judgment in the case.

Whatever help particularized statements might have provided in rebutting Lafarge's claims,[18] Hartford did not take appropriate steps to ensure that judgment was not rendered without that information. Lafarge's evidence was sufficient to establish that the costs it requested were all attributable to the defense of Lafarge and would have been incurred regardless of the involvement of non-insureds in the suit. We must therefore reject Hartford's claims in these respects.

We agree, however, with Hartford's contention that it should not be liable for any defense costs incurred prior to the date Lafarge tendered the amended petition because the "voluntary payment" provision of the policy precludes liability for such pre-tender defense costs.[19] As noted in the previous section, under Texas law, the duty to defend does not arise until a petition alleging a potentially covered claim is tendered to the insurer. *Members Insurance Co. v. Branscum,* 803 S.W.2d 462, 466-67

---

[18]We note too that, given that the non-insureds in the case had their own attorneys, it is unclear how itemized bills would have assisted Hartford in determining what portion of defense costs were expended on behalf of non-insureds. To the extent that the bills would show how Lafarge's attorneys' *legal services* were expended, at least, we think it reasonable to assume that Lafarge's attorneys were billing time on behalf of their client.

[19]Lafarge counters that pre-tender defense costs are recoverable unless Hartford demonstrates that it was actually prejudiced by the delay in tendering the petition. As Hartford correctly notes, however, prejudice is only a factor when the insurer is seeking to avoid all coverage for failure to comply with the notice provisions of the policy. *See Laster v. American National Fire Insurance Co.,* 775 F.Supp. 985, 991 (N.D.Tex.1991) ("Proof of prejudice to the insurer as a result of the breach, or non-compliance, is required in either event for *coverage to be avoided.*") (emphasis added), *aff'd,* 966 F.2d 676 (5th Cir.1992).

(Tex.App.—Dallas 1991, no writ).  The cases on which the district court relied to support its determination that pre-tender costs were recoverable are inapposite.[20]  The terms of the policy are unambiguous and therefore must be enforced as written.[21]  *Ranger Insurance Co. v. Estate of Mijne,* 991 F.2d 240, 243 (5th Cir.1993); *see also Northern Insurance Co. of New York v. Allied Mutual Insurance Co.,* 955 F.2d 1353, 1360 (9th Cir.) (noting that "California courts have consistently honored [voluntary payment]

---

[20]In both *Municipality of San Juan v. Great American Insurance Co.,* 813 F.2d 520, 521-22 (1st Cir.1987), and *Solo Cup Co. v. Federal Insurance Co.,* 619 F.2d 1178, 1188 (7th Cir.), *cert. denied,* 449 U.S. 1033, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980), the courts merely determined that the insureds were entitled to costs and fees involved in defending the actions; there is no indication in either decision that the courts were asked to or did in fact consider whether pre-tender costs were recoverable.  In *Burroughs Wellcome Co. v. Commercial Union Insurance Co.,* 713 F.Supp. 694 (S.D.N.Y.1989), another case relied on by the district court, Burroughs Wellcome faced numerous lawsuits connected to its distribution of DES.  The district court stated that the insurer's duty to defend ran " "*from the time each case or claim is brought* ...' " *Id.* at 697 (emphasis in original).  It is not clear that this is intended to cover pre-tender time.  *Burroughs Wellcome* also is factually distinguishable from the present case.  There, the insured was facing numerous, repeated lawsuits all based on the distribution of the same product.  That is certainly not the case here.  In any event, to the extent, if any, that *Burroughs Wellcome* stands for the proposition that pre-tender defense costs are generally recoverable under policy provisions such as those here, we disagree.

[21]Lafarge argues that notice was tendered eleven months before it began to incur costs above the $250,000 policy deductible.  Apart from its bearing on whether Hartford was prejudiced by the delay in tendering notice, which is not a factor when the insurer is not arguing that the entire policy was forfeited by failure of the condition, *see* note 18, *supra,* this fact does not help Lafarge.  If any expenses incurred before tender are not recoverable, they could not be considered towards satisfaction of the deductible, and Hartford would be entitled to a reduction in damages assessed against it.

provisions, and will not require insurers to pay for voluntarily incurred pre-tender costs"), *cert. denied,* --- U.S. ----, 112 S.Ct. 3033, 120 L.Ed.2d 903 (1992).

Accordingly, on remand, the district court should modify the judgment, reducing Hartford's liability to reflect only those defense costs incurred after tender of the amended petition. As Hartford has waived its other arguments respecting the apportionment of costs, however, no other modification is necessary.

III. Discovery of the Prior Settlement Agreement

As noted previously, Hartford did not become Lafarge's insurer until 1987; before that time, Nationwide Casualty Insurance Company (Nationwide) was Lafarge's primary insurer. In January 1992, Lafarge and Nationwide settled a number of coverage disputes related, *inter alia,* to the underlying litigation in this case. Hartford sought to compel Lafarge to answer its interrogatory requesting information on the amount of the settlement between Nationwide and Lafarge, but Lafarge resisted, asserting that the settlement agreement contained an express confidentiality provision that forbade revelation of the terms of the agreement without prior written consent of all parties.

After a hearing, the district court, on March 5, 1992, ordered Lafarge to produce the settlement agreement for Hartford's inspection upon receipt of an acceptable confidentiality agreement from Hartford. The record contains no evidence of such a confidentiality agreement ever having been forwarded by Hartford,

24

and Lafarge contends that none was ever received. Given the express confidentiality provision of the settlement agreement, we do not think the district court abused its discretion in requiring Hartford to agree to keep the information confidential.

Hartford argues, however, that although it attempted to negotiate with Lafarge, it could not produce an acceptable confidentiality agreement because of the restrictions Lafarge sought to impose on Hartford's use of the information contained in the settlement agreement. But, Hartford never brought this to the district court's attention or filed a subsequent motion or other request with the district court to obtain the settlement agreement or fix the terms of any confidentiality restrictions. We must therefore conclude that it has waived its right to insist on production of this information.

IV. Apportionment of the Deductible

After determining, pursuant to *Porter v. American Optical Corp.,* 641 F.2d 1128 (5th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), that Hartford was liable only for its "time on the risk," the district court held that Lafarge's deductible under the Hartford policy should also be reduced. Although noting that the language of the policy was unambiguous, the district court held

> "[t]hat Hartford demands a full deductible when it has been found responsible for only a portion of Lafarge's defense costs simply does not seem to coincide with either the spirit behind the insurance contract between the parties, or this Court's previous Order which attempted to apportion the defense costs as equitably as possible."

The district court cited *Clemtex, Inc. v. Southeastern Fidelity*

25

*Insurance Co.,* 807 F.2d 1271 (5th Cir.1987), in support of its decision to reduce the deductible.

If the deductible clause truly were unambiguous, Texas law would require that the language be given its plain meaning. *Clemtex,* however, clearly supports the district court's decision to reduce the deductible when the insurer has been held liable for only a prorated share of defense costs. In *Clemtex,* the district court determined that the *Forty-Eight Insulations* proration rule should apply and thereby proportionately reduced each of Clemtex's insurers' liability for costs. We noted that "[e]ach defendant, however, indemnifies Clemtex, under the *Forty-Eight* rule of apportionment, for only part of Clemtex's liability under a silicosis victim's claim. It follows that each insurer herein has been demanding a full deductible for a partial claim. The insurance policies do not clearly so provide." *Id.* at 1276-77. The *Clemtex* Court thus found the policy deductible provisions ambiguous and remanded to the district court to determine what the provisions meant. *Id.* at 1277.

This is exactly the case here. The policy provides that the deductible will apply to each occurrence; it is at best ambiguous as to what happens when the insurer is held liable for only part of a continuous occurrence. The district court therefore did not have to rely on equitable principles in order to reduce the deductible obligation; its decision is supported simply as a valid choice of one of at least two reasonable interpretations of the policy. It did not err in prorating the deductible.

26

V. Award of Prejudgment Interest

Hartford does not contest the award of prejudgment interest but does challenge the district court's decision not to apply the 6% interest rate prescribed by Tex.Rev.Civ.Stat.Ann. art. 5069-1.03 for "contracts ascertaining the sum payable."  The district court held that article 5069-1.03 did not apply because the sum payable under the insurance contract was not ascertainable from the face of the policy.  Hartford argues that there is no such "face of the document" requirement under Texas law and that, because amounts due the insured under the terms of the policy require only a calculation of actual money damages (rather than, for example, damages for pain and suffering), the contract comes within article 5069-1.03.

We are not persuaded.  The very premise of Hartford's argument is unsound because the claim here was for prejudgment interest on the amount of attorneys' fees expended in defense of the underlying litigation, not for damages under the policy.  The cases Hartford cites are factually distinguishable because each involves a claim for liquidated damages.[22]  In *Axelson, Inc. v. McEvoy-Willis,* 7 F.3d

_____

[22]*See Vesta Insurance Co. v. Amoco Production Co.,* 986 F.2d 981, 989 (5th Cir.) (plaintiff entitled to prejudgment interest at 6% statutory rate on amount of loan/advance it made to defendant), *cert. denied,* --- U.S. ----, 114 S.Ct. 80, 126 L.Ed.2d 48 (1993);  *St. Paul Insurance Co. v. Rakkar,* 838 S.W.2d 622, 631 (Tex.App.—Dallas 1992, writ denied) (when insured's claim was for total loss by fire, claim was liquidated demand for full amount of the policy, and contract was for an ascertainable sum payable);  *see also Perry Roofing Go v. Olcott,* 744 S.W.2d 929, 931 (Tex.1988) (stating that prejudgment interest may be awarded on equitable principles "for unascertainable or *unliquidated* contractual damages") (emphasis added).

27

1230 (5th Cir.1993), this Court held that "[t]he issue, then, is whether the contract unambiguously establishes the amount owed. It does not.... The court had to determine that amount, employing general legal concepts. This contract is not within the contemplation of article [5069-]1.03." *Id.* at 1234. As much can be said of the contract here. The district court did not err in setting the rate of prejudgment interest.

## VI. Award of Attorneys' Fees in the Present Action

Lafarge also sought recovery of its attorneys' fees expended in pursuing the instant litigation against Hartford for breach of the insurance contract. Under Texas law, "[a] person may recover reasonable attorney's fees from an individual or a corporation, in addition to the amount of a valid claim and costs, if the claim is for ... an oral or written contract." Tex.Civ.Prac. & Rem.Code § 38.001(8). However, "[section 38.001] does not apply to a contract issued by an insurer that is subject to the provisions of ... Article 21.21, Insurance Code ..." Tex.Civ.Prac. & Rem.Code § 38.006(4). The key question, then, is what it means to be "subject to" article 21.21 of the Texas Insurance Code. Hartford claims that any entity that could potentially face liability under article 21.21 is exempt from an award of attorneys' fees. Lafarge responds that an insurer is only subject to article 21.21 if it has been successfully sued under that article; because Lafarge's Texas Insurance Code claims were dismissed on summary judgment, Lafarge argues, Hartford was not subject to article 21.21 and Lafarge

28

should be allowed to recover its attorneys' fees.[23]

After an extensive discussion of the somewhat conflicted interpretations of Texas law on this subject, the district court determined that Lafarge was entitled to its reasonable attorneys' fees. In reaching this conclusion, the district court determined that it was bound to follow the opinion of the highest Texas court that has spoken on the matter. It therefore looked to the Texas Supreme Court's decision in *Barnett v. Aetna Life Insurance Co.,* 723 S.W.2d 663 (Tex.1987), and determined that the court, by reference to lower court decisions, at least implicitly had adopted an interpretation allowing an award of attorneys' fees in a breach of duty to defend suit. *See id.* at 667. In so doing, however, the district court determined that this Court's decision in *Bituminous Casualty Corp. v. Vacuum Tanks, Inc.,* 975 F.2d 1130 (5th Cir.1992), incorrectly interpreted Texas law.

In *Bituminous Casualty,* we recognized that the Texas appellate courts had allowed parties to recover attorneys' fees in insurance contract cases both before and after the Texas Supreme Court's decision in *Dairyland County Mutual Insurance Co. of Texas v. Childress,* 650 S.W.2d 770 (Tex.1983). *Bituminous Casualty,* 975 F.2d at 1133 & n. 4. Nevertheless, we noted that *Dairyland* itself precluded an award of attorneys' fees in these circumstances: "Art. 2226 [the predecessor to section 38.006] does not apply to

---

[23]Lafarge argues on cross-appeal that the Texas Insurance Code claims were erroneously dismissed on summary judgment. It acknowledges that, if this Court were to reverse the summary judgment as to those claims, section 38.006(4) would operate to bar a double recovery of attorneys' fees.

contracts of certain insurors who are identified in those sections of the Insurance Code enumerated in Art. 2226." *Id.* at 1133 (quoting *Dairyland,* 650 S.W.2d at 775) (footnote and internal quotation marks omitted). We therefore concluded that "[t]his language implies that an insurer who falls within the provisions of section 38.006 is exempt from the payment of attorney's fees and that only those insurers who do not qualify for the exemption are subject to the payment of attorney's fees." *Id.*

We recognize that, after *Dairyland,* the Texas Supreme Court subsequently allowed an insured to recover attorneys' fees in a breach of contract action. *Barnett,* 723 S.W.2d at 667. However, it does not appear from that opinion that the insurer ever argued that section 38.006 precluded an award of such fees against it; indeed, the parties had previously stipulated to a reasonable fee for prosecuting the breach of contract action. *Id.* It is therefore not clear that *Barnett* can be construed as implicitly overruling *Dairyland*'s interpretation of section 38.006. We acknowledge too, as we did in *Bituminous Casualty* itself, that despite *Dairyland* and our interpretation of it in *Bituminous Casualty,* Texas appellate courts continue to award attorneys' fees to insureds who successfully prosecute breach of contract suits against their insurers. Indeed, decisions of this Court, both before and after *Bituminous Casualty,* have assumed that awards of attorneys' fees to successful litigants are appropriate in these circumstances. *See Gulf Chemical & Metallurgical Corp. v. Association Metals & Minerals Corp.,* 1 F.3d 365, 373 (5th

30

Cir.1993);  *Enserch Corp. v. Shand Morahan & Co.,* 952 F.2d 1485, 1500-01 (5th Cir.1992).

However, it is well-settled in this Circuit that "one panel may not overrule the decision, right or wrong, of a prior panel, in the absence of an en banc reconsideration or superseding decision of the Supreme Court."  *Bertram v. Freeport McMoran, Inc.,* 35 F.3d 1008, 1016-17 (5th Cir.1994) (citation and internal quotation marks omitted).  "Moreover, a prior panel decision should be followed by other panels without regard to any alleged existing confusion in state law, absent a subsequent state court decision or statutory amendment which makes this Court's [prior] decision *clearly* wrong."  *Broussard v. Southern Pacific Transportation Co.,* 665 F.2d 1387, 1389 (5th Cir.1982) (en banc) (citation and internal quotation marks omitted;  emphasis added).  Thus, although numerous Texas appellate court decisions have *assumed* that attorneys' fees are recoverable in cases such as this,[24] the parties have not cited any post-*Bituminous Casualty* case from a Texas court, and we have found none, that *directly* confronts the issue we clearly resolved in *Bituminous Casualty.*

In these circumstances, we must follow the holding of *Bituminous Casualty.*  The award of attorneys' fees to Lafarge for the prosecution of this suit is reversed.

VII. Lafarge's Cross-Appeal

Lafarge raises two issues on cross-appeal.  First, Lafarge

---

[24]Likewise, our pre-*Bituminous Casualty* decision in *Enserch* merely assumed that attorneys' fees were recoverable but did not further discuss the issue.

argues that the district court erred in prorating Hartford's liability for defense costs and that a recent Texas Supreme Court case specifically shows that Texas law does not permit such "horizontal stacking" of policy coverages. The record contains no evidence that Lafarge ever objected to the proration of defense costs.[25] We therefore find that Lafarge has waived this portion of its cross-appeal.

Even if error were not waived, however, we would still uphold the district court's decision here. Lafarge's argument that the Texas Supreme Court decision in *American Physicians Insurance Exchange v. Garcia,* 876 S.W.2d 842 (Tex.1994), prohibits policy "stacking" is strained. The question addressed in *Garcia* was whether an insurer's duty to settle a suit was triggered when the settlement demand was outside the policy limits. *See Stowers Furniture Co. v. American Indemnity Co.,* 15 S.W.2d 544, 547-48 (Tex.Comm'n App.1929, holding approved) (duty to defend includes duty to accept reasonable settlement demands within policy limits). Although the insurer's policy limit was $500,000, the injured party never made a settlement demand less than $600,000. *Garcia,* 876 S.W.2d at 853. Because *Garcia* involved a suit for a continuing

---

[25]In fact, it seems clear from the district court's order of February 3, 1992, that Lafarge made no objection to the decision to prorate defense costs. Considering Lafarge's motion for reconsideration of its December 7, 1991, order, the district court stated: "Lafarge argues that, because the Court saw fit to apportion Hartford's responsibility for defense costs, it should also apportion the deductible in precisely the same way." The district court's order does not suggest that Lafarge made any alternative argument contesting the propriety of apportionment in the first instance.

injury (the prescription of drugs over an approximately two-year period), the insured argued that the policy limits of his various insurance policies should be combined (i.e., stacked) to trigger the insurer's *Stowers* duty.  The court disagreed:

> "The consecutive policies, covering distinct policy periods, could not be "stacked' to multiply coverage for a single claim involving indivisible injury....  Simply because a "Claim Occurrence' extends throughout several policy periods does not raise the per-occurrence indemnity cap established in every policy.  Even the jurisdiction embracing the broadest coverage trigger rule has held that multiple coverage does not permit an insured to "stack' the limits of multiple policies that do not overlap."  *Id.* at 853-54 (footnotes omitted).

At most, then, *Garcia* held that an insured cannot get more than he bargained for out of the insurance contract.  *See id.* at 854-55 ("[A]t no time during the four [relevant coverage] years did Garcia carry liability insurance with a per-occurrence limit greater than $500,000.... he may not claim to benefit from $1.5 million in coverage by stacking temporally distinct policies.").  Indeed, the court specifically refused to decide when and under what circumstances any particular policy would be triggered.[26]  *Id.* at 853 n. 20.

As the *Garcia* court recognized, there is apparently no Texas law on the precise issue that faced the district court in this case. *Id.*  In *Porter v. American Optical Corp.,* 641 F.2d 1128 (5th

---

[26]Lafarge's contention that, by quoting one portion of the opinion in *Keene Corp. v. Insurance Co. of North America,* 667 F.2d 1034 (D.C.Cir.1981), *cert. denied,* 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982), *Garcia* thereby adopted the further holding in *Keene* regarding the appropriate trigger date for any one policy both mischaracterizes the Texas Supreme Court's reliance on *Keene* and disregards the clear language of *Garcia* 's footnote 20.

Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), the Fifth Circuit decision on which the district court in the present case relied, this Court adopted the *Forty-Eight Insulations* exposure theory, allowing proration of coverage.[27] *Porter,* 641 F.2d at 1145. Although Lafarge argues that *Forty-Eight Insulations,* which interpreted New Jersey and Illinois law, is not an appropriate paradigm for determining Texas law, the Court in *Porter* relied only on the theory of *Forty-Eight Insulations;* in determining to apply the exposure rule, it applied general Louisiana principles of contract interpretation, which are substantively similar to those applied in Texas.[28] *Id.* We conclude that the district court did not err in prorating Hartford's liability under the *Porter/Forty-Eight Insulations* rule.

Lafarge also challenges the district court's grant of summary judgment to Hartford as to Lafarge's Texas Insurance Code claims. Although Lafarge characterizes the district court's action as *sua sponte,* Hartford moved for summary judgment on these claims, and Lafarge responded to that motion. Moreover, although Lafarge

---

[27]In *Clemtex,* this Court upheld the district court's determination, apparently without citation, that Texas would adopt the *Porter/Forty-Eight Insulations* exposure theory, but only because the parties had not challenged that determination. 807 F.2d at 1274-75.

[28]Under the policy at issue in *Porter,* the term " "[o]ccurrence' [was] defined in each policy to mean an accident or event or a continuous or repeated exposure to conditions which causes or results in bodily injury." *Porter,* 641 F.2d at 1145. Given this language, which is very similar to that at issue here, the Court determined that the plain meaning of the policy was that the policy was triggered when any part of the continuing injury accumulated during the period of coverage (i.e., "occurred"). *Id.*

argues that it was entitled to further discovery because material issues of fact remained as to Hartford's state of mind, we do not think the district court erred in determining that enough discovery had occurred to justify summary judgment.

In addition, Lafarge argues that the district court impermissibly determined disputed issues of fact by finding that Hartford's actions in processing Lafarge's claims to a defense in the underlying suit were reasonable (albeit ultimately mistaken). Lafarge miscomprehends the nature of the reasonableness determination. "While generally a question of fact, reasonableness becomes a question of law if the facts are undisputed." *Continental Savings,* 762 F.2d at 1243. It does not appear that there was any dispute as to the amount of time it took Hartford to investigate and respond to Lafarge's claims. Also, as Lafarge has stressed elsewhere in this appeal, the scope of the duty to defend is determined by reference to the pleadings and the policy, both of which were available to the district court. The district court therefore was clearly in a position to determine, as a matter of law, whether Hartford acted reasonably. It did not err.

## Conclusion

For these reasons, we conclude that Hartford's duty to defend did not arise until tender of the second amended petition, and we therefore reverse the district court's determination to the contrary. We also reverse the award of pre-tender defense costs and the award of Lafarge's attorneys' fees for the prosecution of the breach of contract suit. We affirm in all other respects.

35

This cause is remanded to the district court with instructions to enter a judgment consistent with this opinion.

AFFIRMED in part;  REVERSED in part;  and REMANDED