**LAFARGE CORPORATION and Lafarge Canada Inc., Plaintiffs,**

v.

**NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, Defendant.**

**Civil No. H–95–2795.**

United States District Court, D. Maryland.

Aug. 12, 1996.

Jill A. Douthett, Elizabeth W. Fox and Hoyle, Morris & Kerr, Philadelphia, Pennsylvania, and Robert E. Powell and Smith, Somerville & Case, Baltimore, Maryland for plaintiffs Lafarge Corporation and Lafarge Canada Inc.

Paul S. Schleifman and Lane & Mittendorf, Washington, D.C., Peter F. Axelrad and Jackson & Campbell, Baltimore, Maryland, and Thomas McKay, III and Kathie D. King, Cozen and O'Connor, Philadelphia, Pennsylvania for defendant National Union Fire Insurance Company of Pittsburgh, PA.

ALEXANDER HARVEY, II, Senior District Judge.

In this civil action, the Court has once again been called upon to decide issues concerning insurance coverage for the liability of Lafarge Corporation and Lafarge Canada Inc. (hereinafter collectively "Lafarge") arising as a result of the Lone Star Industries, Inc. (hereinafter *"Lone Star"*) multidistrict proceedings, MDL No. 827. *See In re Lone Star Indus., Inc., Concrete R.R. Cross Ties Litig.,* 882 F.Supp. 482 (D.Md.1995). A trial held in this Court in *Nationwide Mutual Insurance Co. v. Lafarge Corp., et al.,* Civil No. H–90–2390 (Consolidated) in the fall of 1995 resolved coverage issues relating to the duties of certain insurers to defend the Lafarge parties in the *Lone Star* litigation. In the trial of the *Nationwide* case, the jury returned a verdict awarding damages in the amount of $19,485,000 against Travelers Indemnity Company (hereinafter "Travelers"), Hartford Casualty Insurance Company (hereinafter "Hartford") and Boreal Assurances, Inc. (hereinafter "Boreal"). The damages awarded represented the amount of attorneys' fees and expenses found by the jury to have been reasonably incurred by the Lafarge parties in defending the claims asserted against them by Lone Star in the underlying *Lone Star* litigation. In *Nationwide Mutual Insurance Co. v. Lafarge Corp.,* 910 F.Supp. 1104 (D.Md.1996), this Court ruled on Lafarge's post trial motion to mold that jury verdict and directed the entry of final judgments against Travelers, Hartford and Boreal.

This case involves issues relating to the alleged obligation of another insurer to indemnify Lafarge for liability arising as a result of a settlement eventually reached by Lafarge with Lone Star in the underlying litigation. The Lafarge plaintiffs have here sued National Union Fire Insurance Company of Pittsburgh, PA (hereinafter "National Union"), which issued an umbrella liability policy to Lafarge Corporation and Lafarge Canada Inc. for the policy period from April 1, 1989 to April 1, 1990. In their amended complaint, the Lafarge plaintiffs have, *inter alia,* alleged that defendant National Union breached the duty owed by it under this insurance policy to indemnify the Lafarge parties for property damage loss which they became obligated to pay in settling the underlying *Lone Star* litigation.

Proceedings in the underlying *Lone Star* litigation were lengthy and complex. At the first trial held in this Court in the fall of 1992, the jury returned a verdict in favor of the Lone Star plaintiffs against the Lafarge defendants and awarded damages in the amount of $1,213,000. The parties cross-appealed, and in an unpublished opinion dated April 7, 1994, the United States Court of Appeals for the Fourth Circuit vacated this Court's judgment and remanded the case for a new trial on all issues relating to both liability and damages. *In re Lone Star Indus., Inc. Concrete R.R. Cross Ties Litig.,* 19 F.3d 1429 (4th Cir.1994) (table).

At the second trial held in the fall of 1994, the jury again found for the Lone Star plaintiffs and awarded damages against Lafarge in the amount of $8,391,483.50. Following various post trial proceedings, final judgment was entered in favor of Lone Star in the amount of $9,308,057.25. *Lone Star,* 882 F.Supp. at 496–97. Once again, both sides appealed to the Fourth Circuit. During the pendency of the appeal, the parties engaged in settlement negotiations. In July of 1995, Lone Star and Lafarge reached a settlement

of all of Lafarge's potential liability in the underlying litigation in the amount of $11.2 million. Various liability insurers of Lafarge contributed to the payment of this settlement. Defendant National Union did not. In this civil action, the Lafarge plaintiffs contend that defendant National Union is required under the policy issued by it to indemnify them in the amount of $4,865,000, representing National Union's alleged allocated share of the *Lone Star* settlement.

The *Nationwide* suit was instituted in this Court on September 12, 1990, shortly after commencement of the multidistrict litigation which later became MDL 827. The dispute in the *Nationwide* case concerned the potential liabilities of numerous primary, umbrella and excess insurers of both Lafarge Corporation and Lafarge Canada Inc. under policies covering losses resulting from allegedly defective cement manufactured by Lafarge and sold to Lone Star. This cement was used by Lone Star to manufacture concrete railroad cross ties which it sold to various railroads. Issues relating to the premature cracking and deterioration of these cross ties were litigated in the *Lone Star* case. The insurance coverage issues in the *Nationwide* case involved both the duties of Lafarge's many insurers to defend Lafarge in the underlying litigation and their duties to indemnify Lafarge for any judgment or settlement paid. National Union was named by Lafarge in that case as a third-party defendant.

A final pretrial conference was held in the *Nationwide* case on September 29, 1995, and the jury trial in the case was scheduled to commence on October 16, 1995. Shortly before the pretrial conference, Lafarge moved to amend its third-party complaint and add claims that National Union had engaged in unfair claim settlement practices in violation of the Texas Insurance Code and had breached its common law obligations to deal fairly and in good faith with Lafarge when it refused to participate in the *Lone Star* settlement. At the same time, the Lafarge parties filed this separate civil action, naming National Union as the sole defendant and seeking a recovery for National Union's failure to contribute to the Lone Star settlement and for its alleged bad faith in so acting. As a result of settlements reached by Lafarge with other insurers, the only indemnity issue which would have been involved in the *Nationwide* trial was that arising under the National Union policy. Following a hearing, the Court denied Lafarge's motion to amend its complaint in the *Nationwide* case, severed Lafarge's indemnity claim against National Union from the various duty to defend claims remaining in that case, and consolidated in this case Lafarge's breach of contract claim against National Union with the bad faith claims asserted by Lafarge. Lafarge was then granted leave to file an amended complaint in this case. Count I of the amended complaint alleges breach of the insurance contract; Count II asserts a bad faith claim under the Texas Insurance Code; and Count III alleges a common law bad faith claim.

Discovery has now been completed and the parties have filed cross motions for summary judgment. Lafarge seeks summary judgment as to Count I while National Union has moved for summary judgment as to all three counts of the amended complaint. The parties have submitted extensive memoranda and voluminous exhibits in support of and in opposition to their motions. A hearing has been held in open Court. For the reasons to be stated herein, Lafarge's motion for summary judgment will be granted, and National Union's motion for summary judgment will be granted in part and denied in part. Judgment will be entered in favor of Lafarge in the amount of $1,931,666.

### I

*Alleged Breach of Contract*

(a)

*Facts*

The background facts have been discussed in the Court's prior opinions in *Lone Star* and *Nationwide* and need not be repeated in any detail here. Additional relevant facts will be recounted herein as necessary. Defendant National Union issued a $15 million umbrella indemnity policy insuring both Lafarge Corporation and Lafarge Canada Inc. for the policy period of April 1, 1989 to April 1, 1990. During the 1989–90 policy period, the primary insurer of Lafarge Corporation

was Insurance Company of North America ("INA"), whose policy provided for a $1 million "per occurrence" limit and a $2 million aggregate limit. The primary insurer of Lafarge Canada Inc. during this same period was CIGNA of Canada ("CIGNA"), whose policy also provided for a $1 million (Canadian) "per occurrence" limit and a $2 million (Canadian) aggregate limit. In reality, the INA and CIGNA policies were "fronting" policies, and Lafarge was thus self-insured at the primary level during the 1989–90 period.

The umbrella policy issued by it to the Lafarge parties required National Union

> [t]o pay on behalf of the Insured that portion of the ultimate net loss in excess of the retained limit as hereinafter defined, which the Insured shall become legally obligated to pay as damages for ... liability assumed by the Insured under contract because of ... (ii) property damage ... as defined herein caused by an occurrence.

"Ultimate net loss" was defined as the total sum which the insured, or any company as its insurer, or both, became obligated to pay by reason of property damage either through adjudication or compromise.[1] "Property damage" was defined in the policy as:

> (1) physical injury to or destruction of tangible property, which occurs during the policy period, including loss of use thereof at any time resulting therefrom; or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period.

An "occurrence" was defined as:

> an event, including continuous or repeated exposure to conditions, which result in ... Property Damage during the policy period, neither expected nor intended from the standpoint of the Insured. All ... Property Damage arising out of the continuous or repeated exposure to substantially the

same general conditions shall be considered as arising out of one occurrence.

Thus, National Union was required to indemnify Lafarge if Lafarge incurred liability for physical injury to tangible property which occurred during the policy period, or if Lafarge incurred liability for the loss of use of tangible property which was caused by an occurrence during the policy period.

In May of 1989, Lafarge was first notified by Lone Star that cracks were developing in numerous concrete cross ties which had been manufactured by Lone Star and sold to various railroads. The vast extent of the cracking soon became apparent, and the many suits which were filed by various railroads against Lone Star in this and other courts were eventually consolidated in this Court in the multidistrict *Lone Star* action. Lafarge Corporation and Lafarge Canada Inc. were named by Lone Star as third-party defendants in the consolidated case. After two lengthy trials and the filing of cross appeals to the Fourth Circuit on two separate occasions, Lafarge and Lone Star in July of 1995 reached a settlement in the amount of $11.2 million. The settlement encompassed all of Lafarge's potential liability to Lone Star in the cases consolidated in the *Lone Star* action, as well as a small number of cases which had not as yet been consolidated. In Count I of its amended complaint in this case, Lafarge now asserts that National Union under its umbrella indemnity policy must contribute $4,865,000 as its share of the settlement reached.[2]

(b)

*Prior Rulings of this Court*

While the *Lone Star* litigation was pending, Lafarge and its insurers, including National Union, were participating as parties in the *Nationwide* coverage litigation. The *Nationwide* suit had been brought by Nationwide Mutual Insurance Company (hereinafter "Nationwide"), which there sought a

---

1. National Union's limit of liability was $15 million in excess of the primary policies underlying it, or $15 million in excess of $10,000 if the underlying insurance provided no coverage.

2. Because Lafarge seeks to be indemnified for the obligations imposed by the *Lone Star* settlement, the amount awarded by the jury to Lone

Star in the second trial is essentially irrelevant. The settlement represents a reasonable compromise of Lafarge's potential liability in light of the numerous claims asserted by Lone Star and the possibility that the Fourth Circuit might again reverse and remand for a third trial.

declaratory judgment against the Lafarge parties and some of its insurers which would determine the coverage rights and obligations of the parties insofar as the potential liability of Lafarge in the *Lone Star* case was concerned. National Union and many other primary, excess and umbrella insurers were named by Lafarge as third-party defendants in that action. During the five year period before the *Nationwide* case came to trial, this Court filed some fourteen written opinions, ruling on issues raised by Lafarge and the many insurance companies involved in that case. Had Lafarge not filed the bad faith claims now at issue in this case, the breach of contract claim asserted against National Union would have gone to trial in October of 1995, together with the other remaining claims in the *Nationwide* case. The many rulings made by this Court in *Nationwide* prior to September 29, 1995, when Lafarge's breach of contract claim was severed, therefore remain the law of this case as to Count I of the amended complaint. Some of those rulings have now been challenged by the parties.

In its Memorandum and Order of July 15, 1994 in the *Nationwide* case, this Court adopted a formula for the equitable allocation among Lafarge's insurers of the defense costs incurred by Lafarge in the *Lone Star* litigation. The Court first determined that, in light of the allegations in the numerous complaints consolidated in *Lone Star*, all of Lafarge's primary insurers from 1983 through 1990 could potentially be held responsible for indemnifying Lafarge. (Slip op. at 12–19). The Court then adopted a *pro rata* allocation formula based upon each insurer's time "on the risk." (Slip op. at 19–30).

As noted, Lafarge Corporation's primary insurer during the 1989–1990 policy year was INA, and the primary insurer of Lafarge Canada Inc. during that period was CIGNA. The two primary policies issued by these insurers were in fact "fronting policies," and

the Lafarge parties were therefore in essence self-insured up to the limits of liability of these policies. National Union is the excess insurer of both Lafarge Corporation and Lafarge Canada Inc. during this policy period. In its July 15, 1994 ruling, this Court had determined that National Union had no duty to defend Lafarge inasmuch as the insurance underlying the National Union policy had not been exhausted. (Slip op. at 9–12).[3]

In its later Memorandum and Order of August 21, 1995 in the *Nationwide* case, the Court addressed a variety of indemnity issues. *Inter alia*, the Court held that, pursuant to Canadian law, no insurance policy which expired prior to April 1, 1987 was "triggered" for indemnity purposes because there was no "manifestation" or "discovery" of property damage prior to that date. (Slip op. at 25–28). Thus, none of the Canadian carriers which had insured Lafarge Canada Inc. prior to April 1, 1987 had a duty under the pertinent facts to indemnify that insured.

In its ruling of August 21, 1995, the Court rejected Lafarge's belated "request" that the Court further determine that the only policies triggered with regard to Lafarge Canada Inc. were the policies on the risk from April 1, 1989 to April 1, 1990, including the National Union policy. Lafarge had labeled its "request" as such because a formal motion would not have been timely under the schedule set by the Court. Moreover, a question existed as to whether Canadian law even applied to the National Union policy, and Lafarge's alternative contention that the National Union policy would also be triggered under Texas law had not at the time been adequately briefed by the parties. This Court accordingly ruled on August 21, 1995 that, on the then existing record, it could not be "conclusively determined" whether or not the National Union policy was governed by the law of a jurisdiction which applied a so-called manifestation trigger. (Slip op. at 28–30).[4]

---

**3.** The Court also ruled that INA and CIGNA each would be responsible for one-sixth of the reasonable and necessary defense costs incurred by Lafarge in *Lone Star*. (Slip op. at 29). Because the INA and CIGNA policies were fronting policies, Lafarge was therefore responsible for these amounts.

**4.** Nevertheless, the proposal which was made by Lafarge to various insurers and which led to the settlement reached between Lafarge and Lone Star on July 27, 1995 allocated all of the liability of Lafarge Canada Inc. to the 1989–90 policy period.

### (c)
### National Union's Duty to Indemnify Lafarge

The principal issue presented by the parties' cross motions for summary judgment is whether defendant National Union breached its obligation under the insurance policy issued by it to Lafarge to pay a part of the agreed settlement amount of $11.2 million. National Union contends that its obligation to indemnify Lafarge was not "triggered" during the policy period of April 1, 1989 to April 1, 1990. Although previously addressed by the Court in a somewhat different context in the *Nationwide* case, the critical "trigger" issue is once again before the Court for determination. What must now be decided is whether "property damage" occurred during the period of time covered by the National Union policy.

Pursuant to Rule 56, F.R.Civ.P., a moving party is entitled to the entry of summary judgment if there is no genuine issue as to any material fact. Both Lafarge and National Union agree that Texas law is applicable to the breach of contract issue and that the Court can rule on the "trigger" question as a matter of law based on facts established by the record before it. However, the parties are in sharp disagreement concerning the appropriate trigger theory which the Supreme Court of Texas would apply to the facts of this case.

The policy issued by National Union to Lafarge is a standard comprehensive general liability ("CGL") policy, which has been described as "a standard-form policy for liability coverage introduced by the insurance industry in the mid-1960's to deal with the problem of liability for injuries caused over a period of time." *American Home Prods. Corp. v. Liberty Mut. Ins. Co.*, 748 F.2d 760, 762 (2d Cir.1984). Based on the policy terms set forth hereinabove, National Union is contractually required to indemnify Lafarge if Lafarge's obligations under the *Lone Star* settlement arose because of physical injury to tangible property which occurred during the policy period, or if Lafarge's obligations were for the loss of use of tangible property which was caused by an occurrence during the policy period.

This Court has already ruled in the *Nationwide* case that the *Lone Star* litigation involved physical injury to or destruction of tangible property. The gradual and continuous cracking over a period of time and the resulting progressive deterioration of the concrete cross ties sold by Lone Star to the railroads constituted physical injury to tangible property. The *Lone Star* settlement encompassed all of Lafarge's potential liability to Lone Star, including liability related to ties which were removed as a preventive measure by Lone Star's customers even though the ties had not yet begun visibly cracking. It is thus apparent from the record here that the *Lone Star* settlement was based upon physical injury to and physical deterioration of tangible property. National Union therefore cannot disclaim responsibility for paying its fair share of the settlement merely because some ties had not yet visibly cracked during the 1989–1990 policy period.

The primary question therefore facing the Court under the cross motions for summary judgment addressed to Count I of the amended complaint is whether physical injury to the railroad ties "occurred" during the policy period from April 1, 1989 to April 1, 1990, that is, whether the National Union policy was "triggered" during the period of time when such policy was in effect. The parties have suggested a number of different trigger theories which they contend should be applied by this Court under the circumstances of this case. However, the Texas Supreme Court has not adopted a particular trigger theory for cases involving continuing losses like those involved here. *See American Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 853 n. 20 (Tex.1994). In that case, the Supreme Court of Texas noted that "courts across the nation considering the coverage trigger issue for continuing occurrences have disagreed considerably in recent years." *Id.* The Court also noted that Texas had limited precedent on the issue. *Id.* Accordingly, the Court felt that it would be "unwise" to choose a trigger theory in a case where the outcome did not require resolution of that issue. *Id.*

It appears that four principal trigger theories have been recognized by Texas and oth-

er courts. Under a "manifestation of loss" trigger theory, property damage is deemed to occur when a defect first manifests itself or becomes apparent. *See, e.g., Dorchester Dev. Corp. v. Safeco Ins. Co.*, 737 S.W.2d 380, 383 (Tex.Ct.App.1987).[5] An "exposure" trigger theory focuses on the date when the injury-causing agent first comes into contact with the third-party property. *See, e.g., Insurance Co. of No. Am. v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1217 (6th Cir. 1980), *clarified,* 657 F.2d 814 (6th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981). Under an "injury-in-fact" or "damage-in-fact" trigger theory, coverage is triggered when actual injury or damage occurs, and a number of courts have suggested that "injury-in-fact" is the only trigger theory which comports with the language of a standard CGL policy. *See, e.g., Maryland Cas. Co. v. W.R. Grace and Co.*, 23 F.3d 617, 625–26 (2d Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 655, 130 L.Ed.2d 559 (1994). Finally, the "continuous" trigger theory recognizes that property damage occurs continuously from the time of exposure until the time of manifestation. *See, e.g., Owens–Illinois, Inc. v. United Ins. Co.*, 138 N.J. 437, 650 A.2d 974, 981 (1994).

Lafarge contends that this Court should apply a continuous trigger theory in this case because the Texas Supreme Court would adopt such a theory in a case like this one which involves progressive property damage occurring over a period of years. According to Lafarge, the National Union policy would be triggered because the railroad ties continued to deteriorate during the National Union policy period. National Union, on the other hand, contends that the Texas Supreme Court would adopt an injury-in-fact trigger theory and would conclude that the injury-in-fact occurred in this case at the time that the railroad ties were manufactured. In the alternative, National Union argues that a manifestation trigger theory should be applied and that coverage would be triggered when the cracks in the railroad ties initially appeared. According to National Union, its 1989–90 policy would not be triggered under either one of these scenarios.

On the record here, this Court concludes that the Texas Supreme Court, if faced with the circumstances here where progressive property damage extended over a number of different insurance policy periods, would apply an injury-in-fact trigger theory. An injury-in-fact trigger theory satisfies the intention manifested by the plain language of the National Union policy, which provides that coverage would be imposed only if an injury "occurs during the policy period." *See W.R. Grace*, 23 F.3d 617, 625 (2d Cir.1993) ("By the plain language of the policies, injury must *result* during the policy period, but it need not be discovered during that time.") (Emphasis in original). Indeed, by tracking the language of the standard CGL policy, the injury-in-fact trigger theory fulfills the expectations of both the insured and the insurer by imposing liability on an insurer only when actual injury occurs while that insurer is covering the risk.

The injury-in-fact trigger theory has been adopted under New York law and has on several occasions been discussed and approved by the United States Court of Appeals for the Second Circuit. *Stonewall Ins. Co. v. Asbestos Claims Management Corp.*, 73 F.3d 1178, 1194–97 (2d Cir.1995); *W.R. Grace*, 23 F.3d at 625–26; *American Home Prods.*, 748 F.2d at 764–65. In each case in which it considered the requirements of New York law, the Second Circuit based its decision on its interpretation of the plain language of the CGL policy. *See Aetna Cas. & Sur. Co. v. Abbott Lab., Inc.*, 636 F.Supp. 546, 548–49 (D.Conn.1986) (trigger decision in *American Home Products* "was based not on New York law but on the court's reading of the actual policy language").

The opinions of the District Court and the Second Circuit in *Stonewall* are particularly pertinent in this case. In some of the policies involved in *Stonewall* New York law applied while in others the Court was re-

---

5. As this Court discussed in some detail in its Memorandum and Order of August 21, 1995 in *Nationwide,* Quebec law applies a "manifestation" or "discovery" trigger theory. (Slip op. at 24–30) (relying on *Allstate Du Canada Cie D'Assurance c. Assurance Royale Du Canada,* 1994 R.J.Q. 2045 (C.S.)).

quired to apply Texas law. The District Court concluded, and the Second Circuit agreed, that the Texas Supreme Court would adopt the injury-in-fact trigger in cases involving progressive damage. *Stonewall Ins. Co. v. National Gypsum Co.*, No. 86 Civ. 9671 (JSM), 1992 WL 123144 at *15–16 (S.D.N.Y. May 27, 1992), *aff'd in relevant part, rev'd in part sub nom. Stonewall Ins. Co. v. Asbestos Claims Management Corp.*, 73 F.3d at 1209.

Based on the terms of the National Union policy, this Court concludes that the manifestation trigger theory should not be applied because that theory does not necessarily require that an injury "occur" during the policy period. Manifestation may not take place until long after an injury has occurred. However, the plain language of this CGL policy requires that property damage "occur" during the policy period. *See, e.g., American Home Prods.*, 748 F.2d at 764. Indeed, there is no language in a CGL policy indicating that liability should be imposed only when damage becomes apparent, regardless of when the injury occurred. *Id.*

Defendant National Union places heavy reliance on *Dorchester Development Corp. v. Safeco Insurance Co.*, 737 S.W.2d 380 (Tex. Ct.App.1987), a case decided by the Texas Court of Appeals. There, the Court applied a manifestation trigger theory in a case involving defective concrete flooring. The issue facing the Court in *Dorchester* was whether coverage existed for property damage resulting from workmanship performed during the policy period even though the property damage was not manifested until after the policy period. *Id.* at 383. The Court, relying on decisions from Florida and Idaho, held that the insurer was not liable "unless the property damage manifests itself, or becomes apparent, during the policy period." *Id.*

In addition to *Dorchester*, National Union relies on an unpublished decision of the United States District Court for the Northern District of Texas which also applied a manifestation trigger theory under Texas law. *See Carpenter Plastering Co. v. Puritan Ins. Co.*, Civ.A. No. 3–87–2435–R, 1988 WL 156829 (N.D.Tex. Aug. 23, 1988). In that case, the Court, without citing *Dorchester*, found that leakage from faulty wall panels manifested itself prior to the beginning of the insurer's policy period. *Id.* at *6.

Following its review of the Texas cases relied upon by defendant National Union, this Court concludes that the Texas Supreme Court would not follow *Dorchester* and *Carpenter* and would not apply a manifestation trigger theory to the circumstances of this case. As discussed hereinabove, the manifestation trigger theory ignores express language of the National Union policy which provides that coverage is imposed only if an injury "occurs" during the policy period. This Court is satisfied that the Texas Supreme Court would determine that the plain language of the policy at issue here requires the application of the injury-in-fact trigger theory. Moreover, this Court would agree with the District Court and the Second Circuit in *Stonewall* that the Texas Supreme Court would adopt an injury-in-fact trigger theory under circumstances like those present in this case involving continuously occurring injury. In sum, this Court will not apply a manifestation trigger theory in this case. Rather, this Court concludes that the Texas Supreme Court, adhering to the plain language of the National Union policy, would apply an injury-in-fact trigger to the insurance policy here at issue.

What must next be determined is when, under the circumstances of this litigation, injury-in-fact occurred. National Union argues that injury-in-fact occurred only at the time that the defective cement was incorporated into the railroad ties, namely, at the time of manufacture. In support of its position that the triggering event was the date of the incorporation of the Lafarge cement into the railroad ties and that such date occurred before April 1, 1989, National Union relies upon a number of "asbestos-in-building" cases, holding that only the date of the installation of asbestos was relevant in determining when an insurance policy was triggered. *See Stonewall*, 73 F.3d at 1209–10; *W.R.Grace*, 23 F.3d at 627.[6]

---

**6.** The Court would note that Lone Star continued   to manufacture ties containing Lafarge cement

■ This Court cannot agree with National Union that injury-in-fact occurred in this case only at the time that Lafarge's cement was incorporated into the railroad ties. Rather, this Court is satisfied that the Texas Supreme Court would determine that injury-in-fact occurred continuously from the time that the railroad ties were manufactured until the time that Lone Star notified Lafarge of the problems with cracking and deterioration. Chemical reactions which occurred on a continuing basis within the ties caused the cracking and deterioration over a period of time after the ties were manufactured.[7] Thus, the cracking and deterioration occurred both before and during the 1989–90 policy period.

Under the terms of a CGL policy like the one at issue here, injury-in-fact can extend through multiple policy periods. Indeed, in *Stonewall*, the Second Circuit "confidently" predicted that the Texas Supreme Court would permit triggering "throughout the period between exposure and date of claim or death in all cases in which the evidence persuades the trier of fact that successive injuries are recurring." 73 F.3d at 1197; *see also W.R. Grace*, 23 F.3d at 628 ("If property damage is ongoing, then it is possible to trigger several successive insurance policies because the damage-in-fact occurs over a time continuum."). In this case, the ongoing deterioration of the railroad ties constituted injury-in-fact extending over multiple policy periods. The "asbestos-in-building" cases relied upon by National Union are clearly distinguishable. The Second Circuit in both *Stonewall* and *W.R. Grace* specifically noted that there was no progressive damage to the

buildings in question after the asbestos had been installed and that injury-in-fact was limited to a specific date in "asbestos-in-building" cases because there was an absence of progressive injury. *Stonewall*, 73 F.3d at 1210; *W.R. Grace*, 23 F.3d at 628. By way of contrast, the railroad ties here at issue progressively deteriorated after the incorporation of the defective cement, and injury-in-fact therefore continued beyond the date of such incorporation.[8]

It is undisputed that Lafarge did not learn from Lone Star that the railroad ties were deteriorating until May of 1989. Moreover, there is no indication in the record that Lafarge could reasonably have learned of the deterioration prior to May of 1989. Accordingly, injury-in-fact continued to occur after the National Union policy became effective on April 1, 1989, and the National Union policy was therefore triggered for indemnity purposes.

For these reasons, the Court concludes that the National Union 1989–90 policy provided coverage for property damage loss sustained by the Lafarge parties in the *Lone Star* litigation and that National Union breached its contract of insurance when it refused to contribute to the settlement with Lone Star.

### (d)

### The "Sistership" Exclusion

In opposing plaintiffs' motion for summary judgment as to Count I of the amended complaint, National Union further contends that exclusion (E) of the policy issued by it to

---

after April 1, 1989. National Union contends that the jury did not in the *Lone Star* trial impose any liability on Lafarge for damage to these ties. However, National Union is required in this case to indemnify Lafarge for the *Lone Star* settlement, not for the liability found by the jury. The settlement included all potential liability for deterioration of railroad ties, including damage occurring after April 1, 1989.

7. Accordingly, in this case, the same result is reached under the injury-in-fact trigger theory that would be reached under the continuous trigger theory. This is not always true. *See TBG, Inc. v. Commercial Union Ins. Co.*, 806 F.Supp. 1444, 1453 (N.D.Cal.1990).

8. National Union also relies upon *Eljer Manufacturing, Inc. v. Liberty Mutual Insurance Co.*, 972 F.2d 805 (7th Cir.1992), *cert. denied*, 507 U.S. 1005, 113 S.Ct. 1646, 123 L.Ed.2d 267 (1993), where the Seventh Circuit held that, under Illinois and New York law, the installation of a defective plumbing system constituted the relevant physical injury under a CGL policy. *Id.* at 814. However, the defective plumbing system in *Eljer* did not cause the same type of progressive property damage as did the defective cement in this case. This Court is not satisfied that the Texas Supreme Court would adopt under the circumstances here the Seventh Circuit's reasoning in *Eljer*.

Lafarge precludes coverage in this case.[9] Exclusion (E), commonly known as the "sistership" or "product recall" exclusion, provides that the policy shall not apply

to damages claimed for the withdrawal, inspection, repair, replacement or loss of use of the Insured's products or work completed by or for the Insured or of any property of which such products or work form a part, if such product, work or property are withdrawn from the market or from use by anyone because of any known or suspected defect or deficiency therein.

National Union argues that a substantial portion of the *Lone Star* settlement reflected damages for the withdrawal, replacement and loss of use of railroad ties which had not yet begun cracking. According to National Union, all of these damages should be excluded from coverage.

■ This Court is satisfied that exclusion (E) cannot be relied upon by National Union as a defense in this case. Under Texas law, the sistership exclusion does not apply when, as here, a third party has sued the insured for property damage. *Gulf Ins. Co. v. Parker Prods., Inc.*, 498 S.W.2d 676, 678–79 (Tex.1973). Indeed, the clause in question is not intended to exclude from coverage "damages caused by the very product whose failure to perform properly aroused apprehension about the quality of 'sister' products. . . ." *Gulf Miss. Marine Corp. v. George Engine Co., Inc.*, 697 F.2d 668, 674 (5th Cir.1983) (quoting *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 419 (5th Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 448, 74 L.Ed.2d 602, 603 (1982)).

Accordingly, the Court concludes that exclusion (E) does not apply in this case and does not preclude the coverage provided by National Union's policy.

### (e)

### *Damages*

■ Pursuant to the allocation scheme for the *Lone Star* settlement proposed by Lafarge to its other indemnity insurers and accepted by them, Lafarge now seeks $4,865,000 from National Union.[10] $100,000 of this total sum represents liability to Lafarge Corporation in excess of the $1 million (U.S.) allocated to INA. The remaining $4,765,000 represents liability to Lafarge Canada Inc. in excess of the $1 million (Canadian) allocated to CIGNA.[11] Insofar as Lafarge Corporation's share and Lafarge Canada Inc.'s share of the $11.2 million settlement were concerned, Lafarge's proposed allocation had first split in half the sum of $11 million after deducting $200,000 contributed by Travelers.[12] $5.5 million was allocated to insurers of Lafarge Corporation on the United States side and $5.5 million was allocated to insurers of Lafarge Canada Inc. on the Canadian side.

On the United States side, Nationwide was allocated $528,000 and Columbia Casualty Company $572,000 for the 1985–86 years; Nationwide was allocated $1.1 million for the 1986–87 years; Hartford was allocated $1.1 million for the 1987–88 years; INA was allocated $1 million and Reliance Insurance Company $100,000 for the 1988–89 years; and INA was allocated $1 million and National Union $100,000 for the 1989–90 years.[13] On the Canadian side, only the 1989–90 policy years received any allocation at all. In its Memorandum and Order of August 21, 1995 in the *Nationwide* case, this Court ruled that under applicable Canadian law, a "manifesta-

---

9. National Union has now abandoned its affirmative defense based on the contention that the property damage at issue was "expected and intended" by Lafarge and was therefore excluded from coverage.

10. At the request of the Court, the parties have submitted supplemental memoranda addressing the issue of allocation in this case.

11. $1 million (Canadian) was equivalent to $735,000 (U.S.) at the time of the *Lone Star* settlement.

12. Travelers had agreed to contribute $200,000 for the early policy years 1983–85 in order that the full $11.2 million figure could be reached.

13. This Court had previously ruled in *Lone Star* that all claims asserted against Lafarge for damages incurred prior to 1985 were barred by limitations.

tion" or "discovery" trigger of coverage theory applied to each of the Canadian policies issued to Lafarge Canada Inc. and that no such manifestation or discovery of the property damage at issue had occurred before April 1, 1987. (Slip op. at 24–30). Anticipating the Court's ruling of August 21, 1995, Lafarge took the position in its proposed allocation scheme that all insurers prior to April 1, 1989 had no obligation to indemnify Lafarge Canada Inc. for loss arising out of the *Lone Star* case. This left on the Canadian side only CIGNA, whose primary policy was controlled by Canadian law, and National Union, whose umbrella policy was controlled by Texas law.

Lafarge now seeks to impose a substantial portion of the *Lone Star* settlement on National Union, the umbrella insurer of Lafarge Canada Inc. for the 1989–90 policy period. Indeed, Lafarge insists that National Union must pay more than 43% of the $11 million allocated to indemnity insurers after deducting the contribution made by Travelers. Lafarge relies on *American Physicians Insurance Exchange v. Garcia*, 876 S.W.2d 842 (Tex.1994), for the principle that, when a single occurrence stretches over multiple policy periods, the insured may choose a single policy period from which to collect the entire amount of liability. *Id.* at 855. According to Lafarge, it is then the responsibility of the chosen insurer to seek contribution from other policies which might be triggered. *See also CNA Lloyds v. St. Paul Ins. Co.*, 902 S.W.2d 657, 660–61 (Tex.Ct.App.1995) (indicating that "other insurance" clauses of triggered policies will determine appropriate contributions among insurers).

Lafarge's "strained" interpretation of *Garcia* will be rejected. *See Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389, 403 (5th Cir.1995). In *Garcia*, the Texas Supreme Court held that policies from different periods could not be "stacked" for the purpose of imposing on an insurer a duty to settle. 876 S.W.2d at 853. Thus, an insured which had taken out separate $500,000 policies for three consecutive years could not aggregate the "temporally distinct" policies to require the insurer to accept a settlement offer of more than $500,000. The Lafarge parties argue

that the prohibition against "stacking" policies in *Garcia* allows them to impose responsibility for indemnifying Lafarge Canada Inc. for all of its portion of the settlement solely on CIGNA and National Union in the 1989–90 policy year.

In *Lafarge v. Hartford*, the Fifth Circuit flatly rejected Lafarge's contention in that case that, under *Garcia*, Lafarge could require the insurer Hartford to pay all of Lafarge's defense costs, thereby leaving Hartford to seek contribution from other insurers. *Id.* at 404. Rather, the Fifth Circuit concluded that *Garcia* meant, at most, that an insured could not get more than he bargained for out of the insurance contract. *Id.* Accordingly, the Fifth Circuit determined that a *pro rata* allocation was appropriate. *Id.*

This Court has previously in its Memorandum and Order of July 15, 1994 in the *Nationwide* case relied upon the District Court's opinion in *Lafarge v. Hartford* in ruling that an equitable apportionment scheme should be applied insofar as the defense obligations of Lafarge's insurers were concerned. For the reasons stated both in the *Nationwide* Memorandum and Order of September 30, 1992 (slip op. at 5–7) and in the *Nationwide* Memorandum and Order of July 15, 1994 (slip op. at 19–30), this Court now concludes that an equitable apportionment scheme should likewise be applied insofar as the indemnity obligations of all of Lafarge's insurers are concerned. Several courts interpreting Texas law have recognized that under circumstances like those present here liability should be allocated prorationally. *See Clemtex, Inc. v. Southeastern Fidelity Ins. Co.*, 807 F.2d 1271, 1274–75 (5th Cir.1987); *Stonewall Ins. Co. v. National Gypsum Co.*, 1992 WL 163180 (S.D.N.Y. June 24, 1992), *aff'd in relevant part*, 73 F.3d at 1201–04. In the *Stonewall* case, the District Court ruled that the triggered policies' obligations should be prorated based upon their respective triggered time periods. 73 F.3d at 1202. That ruling was neither challenged nor altered on appeal. As the District Court noted, "a plain reading of the policy language at issue suggests that where numerous policies are triggered, liability should be apportioned on a *pro rata* basis

among the insurers and the insured." 1992 WL 163180 at *1. Only by the application of such a scheme in this case can there be a fair and equitable determination of National Union's obligation to contribute to the $11.2 million settlement.[14] The question that remains is what would be a fair and equitable apportionment under all the circumstances here.

This Court would agree with Lafarge that the only policy period triggered on the Canadian side is that between April 1, 1989 and April 1, 1990, pursuant to the CIGNA and National Union policies. Under the circumstances here, Lafarge could not reasonably have foreseen prior to April 1, 1989 that the railroad ties were defective and in need of replacement. Lafarge had no knowledge of and no reason to know of the deterioration of the ties before it was notified by Lone Star of the problem in May of 1989. Therefore, the policies issued to Lafarge Canada Inc. by Canadian insurers which expired before May of 1989 and which are controlled by Canadian law were not triggered. *See Allstate*, 1994 R.J.Q. 2045 (C.S.). The only coverage on the Canadian side thus was that provided by the CIGNA and National Union 1989–90 policies. The CIGNA primary policy was triggered under Canadian law, and, as the Court has held herein, the National Union umbrella policy was triggered under Texas law.

The principal argument advanced by Lafarge in support of its contention that a fair and equitable apportionment scheme would require National Union to pay $4.865 million of the $11.2 million settlement is that the joint *Lone Star* settlement should initially be divided between Lafarge Corporation and Lafarge Canada Inc. 50–50 (after deducting the Travelers contribution). The primary policy for the 1989–90 period was that issued by CIGNA. Its $1 million (Canadian) policy translates into $735,000 (U.S.). Lafarge maintains that National Union, as the umbrella carrier insuring Lafarge Canada Inc., is responsible for the difference when the CIGNA amount is subtracted from $5.5 million, or $4,765,000. When the $100,000 allo-

cated on the Lafarge Corporation side is added to this sum, Lafarge's proposed allocation scheme imposes on National Union the obligation to contribute 43.4% of the $11.2 million settlement while other insurers (including Lafarge itself under its fronting policies) would be required to contribute very small percentages. According to Lafarge, any resulting inequity could have been avoided if National Union had sought contribution from the other insurers.

This Court cannot agree with Lafarge that it was fair and equitable to allocate one-half of $11 million, or $5.5 million to the insurers of Lafarge Canada Inc. A similar 50–50 proposal was previously made by Travelers insofar as defense costs were concerned and was rejected by the Court in its Memorandum and Order of July 14, 1994 in the *Nationwide* case. (Slip Op. at 27). As the Court there ruled, there is no rational basis under all the circumstances of this complex case for determining a fair allocation of the amount attributable to Lafarge Corporation and the amount attributable to Lafarge Canada Inc. The settlement in question was based on the allegations of the Lone Star complaints, the facts developed at the jury trials, the jury verdicts, the pending appeal and evidence pertaining to the future risks of litigation faced by the parties. The Court will now reaffirm its prior ruling in the *Nationwide* case which is equally applicable in a case involving indemnity obligations. Moreover, the Court has previously rejected Lafarge's contention that a single insurer should pay all of the amounts due when there are multiple insurers covering the risk and then seek contribution from other insurers. As the Court said in its prior ruling of July 15, 1994 (slip op. at 26–27):

> Apportionment at this stage of these proceedings can be expected to minimize the considerable expense of further litigation. Were the Court to order that Travelers alone or some other insurer must pay all of the defense costs incurred by Lafarge, claims of contribution asserted against other primary insurers would certainly be

14. National Union has not challenged the reasonableness of the $11.2 million settlement. However, it vigorously disputes Lafarge's allocation scheme which would require National Union to pay $4.865 million of the settlement amount.

pursued. An equitable apportionment scheme should lessen or obviate the need for subsequent rounds of litigation. In a complex case of this sort involving a great many insurers, numerous different policy periods and two different insured entities operating in different countries, second and third rounds of litigation can be expected to result in substantial additional litigation costs for the parties. Although not explicitly so stated in *Forty–Eight Insulations* or its progeny, concerns of this sort were no doubt recognized by those courts in approving apportionment schemes of the sort adopted here.

As other courts have recognized, the fairest and most equitable formula to be applied in a case of this sort is one whereby obligations are apportioned on a *pro rata* basis according to the number of years during which the insurers had assumed the risk. *Insurance Co. of No. Am. v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980), *clarified* 657 F.2d 814 (6th Cir.), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389 (5th Cir.1995); *Porter v. American Optical Corp.*, 641 F.2d 1128, 1145 (5th Cir.), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981); *Gulf Chem. & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 1 F.3d 365 (5th Cir.1993). Lafarge argues that the Court should not now apply in this case the principles of *Forty–Eight Insulations*. However, on two prior occasions in the *Nationwide* case, this Court cited and relied on *Forty–Eight Insulations* in rejecting arguments similar to those now advanced by Lafarge. In its Memorandum and Order of September 30, 1992 in *Nationwide*, this Court rejected Lafarge's contention that a single insurer (Travelers) should be held liable for all of Lafarge's defense costs, citing the District Court's opinion in *Lafarge Corp. v. Hartford*. Subsequently, in its Memorandum and Order of July 15, 1994 in *Nationwide*, this Court once again cited and relied on *Forty–Eight Insulations* and *Lafarge v. Hartford* in adopting an apportionment scheme based on years on the risk. Moreover, in *Gulf Chemical*, the Fifth Circuit, applying Texas law, adopted the apportionment scheme of *Forty–Eight Insulations* in a case involving apportionment of costs among *seriatim* insurers to defend against tort claims for injuries which developed over a long term period of time. 1 F.3d at 371.

There is no merit to Lafarge's argument that although the *Forty–Eight Insulations* apportionment scheme may be applied in a case involving duty to defend obligations, it is not appropriate in a case involving indemnity obligations. Numerous courts have applied *pro rata* allocation schemes in cases involving an insurer's duty to indemnify its insured. *See, e.g., Stonewall*, 73 F.3d 1178; *Forty–Eight Insulations*, 633 F.2d at 1224; *Uniroyal, Inc. v. Home Ins. Co.*, 707 F.Supp. 1368, 1392–94 (E.D.N.Y.1988).

When the *Forty–Eight Insulations* allocation scheme is applied in this case, it is apparent that there are a total of six periods during which indemnity insurers of the two Lafarge entities provided coverage for the property damage in question. A fair and equitable apportionment scheme would therefore allocate one-sixth of $11 million, or $1,833,333 to each policy period. The National Union policy is implicated in two of the six policy periods. It insured Lafarge Corporation for the 1989–90 policy year, and it separately insured Lafarge Canada Inc. for that same policy year. The primary insurer of Lafarge Corporation for the 1989–90 policy year was INA which had issued a $1 million policy. As the excess carrier for that policy year, National Union is therefore responsible for $1,833,333 less $1 million, or $833,333, for its portion of the settlement attributable to Lafarge Corporation in the year in question. When the amount of the $735,000 (U.S.) primary policy issued by CIGNA to Lafarge Canada Inc. is deducted from the $1,833,333 figure, the sum owed by National Union on the Canadian side is $1,098,333. Under this equitable allocation scheme, National Union is responsible for the total aggregate amount of $1,931,666 for the two policy years allocated to it.

In its supplemental memorandum, Lafarge contends that National Union did not question or object to the concept of dividing the settlement amount equally between the in-

surers of Lafarge Corporation and those of Lafarge Canada Inc. and that principles of estoppel require that National Union "not be allowed to reverse its position. . . ." This is a specious argument. National Union has never reversed its position. As discussed more fully in Part II of this Opinion, National Union consistently took the position in June and July of 1995 that it had no obligation under its policy to contribute to the funding of the settlement. Certainly, in view of its denial of coverage, National Union had no obligation to object to the reasonableness of the settlement amount or address in any way the allocation scheme proposed by Lafarge.

Obviously, other insurers were quite ready to accept Lafarge's proposed allocation scheme since National Union was being saddled with more than 43% of the total settlement amount. That Lafarge and these other insurers readily accepted Lafarge's proposal hardly indicates that it was a fair and equitable allocation scheme insofar as National Union was concerned. Lafarge itself had a considerable self-interest. It decided to accept the proposed $11.2 million settlement even though National Union had refused to contribute. The proposed 50–50 split, as opposed to apportionment based on years on the risk, saved Lafarge's other insurers more than $2.9 million in the funding of the settlement. Since Lafarge has now settled with the other insurers except Hartford, the Lafarge parties must assume payment of that portion of the settlement.

National Union argues that the relevant limits of liability of the primary policies issued by INA and CIGNA should be the $2 million aggregate limits rather than the $1 million "per occurrence" limits applied by the Court in its allocation scheme. If this were true, it would reduce to zero the amount owed by National Union under the umbrella policy issued by it to the Lafarge parties. National Union argues that the aggregate limits in the INA and CIGNA policies should be used because the "batch clauses" in those policies require that each substandard batch of cement sold by Lafarge to Lone Star must be considered an "occurrence." According to National Union, the multiple sales made during the National Union policy period would therefore constitute multiple occurrences which would require INA and CIGNA of Canada to be responsible for their aggregate policy limits.

This contention has no merit. This Court has already rejected the argument that each sale of cement constituted a separate occurrence. At the close of all the evidence in the *Nationwide* trial, the Court, in ruling on Lafarge's motion for judgment as a matter of law, held that all of Lafarge's liability arose out of a single occurrence as that term is defined in a "per occurrence" policy. (October 31, 1995 Tr. at 4030–32). The Court further rejected the arguments of Hartford and Boreal that the "batch" or "lot" clauses in their respective policies required Lafarge to pay a separate deductible for each sale of cement. The clauses stated that all property damage arising out of one batch or lot was to be considered a single occurrence. *Id.* at 4039. The Court held that the batch clauses did not require that property damage arising out of multiple batches or lots be considered multiple occurrences. *Id.* at 4039–4041.

This Court's prior ruling concerning the number of occurrences in this matter is equally applicable here. The Court will therefore reaffirm its prior ruling that there was a single occurrence in this case. The INA and CIGNA primary policies which underlie the National Union umbrella policy therefore each provide coverage for a single occurrence only. Accordingly, the limit of liability of each of those policies is the $1 million "per occurrence" limit and not the $2 million aggregate limit.

Relying on *Willcox v. American Home Assurance Co.*, 900 F.Supp. 850, 856 (S.D.Tex.1995), National Union also argues that it is responsible for only a small portion of the settlement because the settlement must be apportioned between claims covered by the National Union policy and those that are not. However, without regard to interest, defense costs or other components, the entire amount of the indemnity claim asserted by Lafarge against National Union in this case was clearly covered by the *Lone Star* settlement. The settlement terminated Lone Star's appeal which sought reversal of this Court's denial of Lone Star's motion for a

new trial on damages and its denial of Lone Star's Chapter 93A claim. *See Lone Star,* 882 F.Supp. at 488–495. Had Lone Star been successful in that appeal, Lafarge faced a potential liability in excess of $100 million. The $11.2 million settlement encompassed, *inter alia,* all of Lafarge's potential liability to Lone Star in the consolidated *Lone Star* action.

For all these reasons, the Court concludes that the amount of damages to which the Lafarge parties in this case are entitled under Count I of the amended complaint is $1,931,666. Judgment in that amount will be entered in favor of the Lafarge plaintiffs against defendant National Union.

## II

### *Alleged Bad Faith Conduct*

In Count II of its amended complaint, Lafarge alleges that National Union violated the Texas Insurance Code by engaging in unfair claim settlement practices, including (1) failing to acknowledge with reasonable promptness pertinent communications with respect to claims arising under its policy; (2) failing to attempt in good faith to effectuate prompt, fair, and equitable settlement of submitted claims in which liability had become reasonably clear; and (3) compelling its policyholder to institute and to continue to prosecute a suit to recover amounts due under its policy. Lafarge has alleged in Count III of its amended complaint that National Union breached its common law obligation to deal fairly and in good faith with Lafarge by denying and delaying payment of its share of the settlement in the absence of any reasonable basis for denying and delaying such payment. Lafarge seeks compensatory damages under both Count II and Count III, and it also seeks treble damages and attorneys' fees for National Union's alleged violation of the Texas Insurance Code. National Union has now moved for summary judgment as to both of these bad faith claims.

### (a)

### *Facts*

On April 3, 1995, this Court entered a Final Judgment Order in the consolidated *Lone Star* action. *See* 882 F.Supp. 482. By letter dated April 4, 1995 and addressed to all counsel in *Nationwide,* Lafarge's counsel suggested that a settlement between Lafarge and Lone Star which would avoid a second appeal to the Fourth Circuit would be beneficial to both Lafarge and its insurers. Each insurer was invited to provide its thoughts on this matter. Lafarge contends that National Union never communicated any position in favor of or against settlement in response to this letter.

On April 27, 1995, by a telecopy marked "URGENT," Lafarge's counsel notified counsel for all insurers that Lone Star had made a $15 million settlement demand. The letter requested a reply from the insurers as soon as possible. According to Lafarge, National Union once again did not communicate any position in favor of or against settlement in response to this letter. Shortly thereafter, Lafarge rejected Lone Star's $15 million settlement demand, concluding that it was too high.

At a scheduling conference held in the *Nationwide* case on June 9, 1995, counsel for National Union stated that their reading of language of the policy indicated that none of the umbrella carriers "owe a dime...." That same day, Lafarge's counsel addressed a letter to the insurers' attorneys indicating that a $10 million settlement offer could be made by Lafarge to Lone Star if the insurers of Lafarge Canada Inc. could provide $5 million (U.S.). Lafarge accordingly proposed an allocation scheme whereby National Union would contribute $280,000. Although the letter requested a response by early the following week, National Union did not offer to contribute to this funding scheme. In any event, Lone Star shortly thereafter declined to accept the $10 million offer.

By letter dated June 26, 1995, Lafarge's counsel indicated that Judge Harry Martin, a retired justice of the North Carolina Supreme Court who was serving as the settlement judge on behalf of the Fourth Circuit in the *Lone Star* appeal, wished to schedule a settlement conference at the end of the following week in Richmond, Virginia, to be attended by all of Lafarge's insurance carriers. Lafarge's counsel requested an immedi-

ate response concerning the availability of each insurer. National Union's counsel promptly responded by letter dated June 27 which requested further information. The very next day, Ms. King, on behalf of National Union stated by letter that her client did not wish to participate in any such meeting because, *inter alia*, National Union had "no obligation to contribute to the funding of the settlement." On June 30, National Union and other excess insurers filed a motion in the *Nationwide* case seeking summary judgment in their favor as to their alleged liability to the Lafarge parties under their indemnity policies. In that motion, National Union and the other insurers argued, *inter alia*, that there had been no occurrences within the policy periods which would obligate them to indemnify the Lafarge parties. That same day, Lafarge filed a motion for partial summary judgment, addressing issues of deductibles and limits of liability.

By letter dated July 12, 1995, Lafarge's counsel provided an update concerning settlement negotiations with *Lone Star*. On behalf of Lafarge, Ms. Douthett indicated that a settlement could likely be reached for some amount between $10 million and $13 million if sufficient funds would be contributed by Lafarge's insurers. According to Lafarge, National Union failed to respond to this request.

A flurry of activity relating to the settlement occurred near the end of July and the beginning of August. On July 27, 1995, Lone Star and Lafarge reached a final settlement agreement at the $11.2 million figure. By letter dated July 28, Lafarge's counsel outlined to all insurance counsel a basic allocation scheme, including the requirement that National Union would be responsible for contributing $4,865,000 of the $11.2 million settlement. All of the insurers except for National Union accepted Lafarge's allocation proposal.[15]

National Union's suggested share consisted of $100,000 as the umbrella insurer of Lafarge Corporation and $4,765,000 as the umbrella insurer of Lafarge Canada Inc. On July 28, Lafarge submitted in the *Nationwide* case a brief in "reply" to the pending

motion for summary judgment which Halifax Insurance Company and Employers Insurance of Wausau had filed in that case based on the trigger of coverage theory under Canadian law. Lafarge "requested" that the Court determine, in ruling on that motion, that, of the insurers of Lafarge Canada Inc., only those policies on the risk during the 1989–90 policy period were triggered.

By letter dated August 3, 1995, Lafarge's counsel restated to all counsel the allocation formula outlined in their July 28 letter. On August 4, National Union filed a "surreply" brief responding to Lafarge's "request." In that brief, National Union opposed Lafarge's contention that only the policies issued to Lafarge Canada Inc. for the April 1, 1989 to April 1, 1990 period were "triggered" for indemnity purposes. Later, having received no written response from National Union's attorneys to the July 28 and August 3 letters, Lafarge's attorneys informed National Union's counsel by letter dated August 14 that, pursuant to the Texas Insurance Code, Lafarge would seek actual and treble damages if National Union did not contribute within thirty days the sum of $4,865,000 as its allocated portion of the *Lone Star* settlement (hereinafter, "the thirty-day letter").

On August 18, 1995, Lafarge's insurers were provided with copies of the final *Lone Star* settlement agreement. Lafarge requested that the insurers pay their allocated portions to Lafarge by August 28, in order that Lafarge could make final payment to Lone Star on August 31. National Union did not make any contribution at that time, nor has it done so since then.

On August 21, 1995, this Court filed its Memorandum and Order in *Nationwide* granting summary judgment in favor of certain Canadian insurers because their policies were not triggered under Canadian law. In that same opinion, this Court denied the motion for summary judgment of National Union and other excess and umbrella insurers, denied Lafarge's motion for partial summary judgment, and denied Lafarge's "request" that the Court determine that only the policies issued by the insurers of Lafarge

---

**15.** Hartford paid its share under a reservation of rights.

Canada Inc. covering the 1989–90 policy period were triggered.

On September 12, 1995, National Union timely responded to Lafarge's thirty-day letter. National Union asserted that it was not required to contribute to the *Lone Star* settlement because its policy was not triggered, because Lafarge's loss was "expected and intended," because there were multiple occurrences, and because coverage was excluded by certain "business risk" exclusions.

Lafarge now contends that National Union's conduct beginning in the spring of 1995 constituted bad faith under the Texas Insurance Code, as well as under common law principles. National Union insists that it acted reasonably under the circumstances and that at no time did it have an obligation under its policy to contribute to the *Lone Star* settlement.

### (b)

### *Applicable Principles*

■ In support of its motion for summary judgment addressed to Lafarge's bad faith claims, National Union first contends that Lafarge's claim under the Texas Insurance Code fails as a matter of law because none of National Union's alleged bad faith acts occurred in Texas. This contention is without merit. The policy at issue was negotiated, underwritten, paid for and delivered in Texas. The policy therefore is governed by Texas law, including the bad faith provisions of the Texas Insurance Code.

■ National Union next contends that, based on Maryland choice of law principles, Virginia law is applicable to Lafarge's common law bad faith claims. This contention likewise must be rejected. In its Memorandum and Order of September 30, 1993 in *Nationwide,* this Court ruled that Texas law applied to Lafarge's common law bad faith claims asserted against Hartford and Travelers. The Court reasoned that:

> The determination of whether or not Travelers and Hartford acted in bad faith in failing to defend Lafarge cannot be made without first determining the scope of their obligations under the relevant policies. Analysis of the scope and content of Lafarge's bad faith claims is inextricably in-

tertwined with the necessity of interpreting the underlying policies. *See Allis–Chalmers Corp. v. Lueck,* 471 U.S. 202, 218 (1985). Travelers and Hartford concede, as they must, that Texas law governs the interpretation of these policies for purposes of Lafarge's breach of contract claims. To interpret these same policies under Maryland law for purposes of Lafarge's bad faith claim would be unnecessarily confusing and would subject Travelers and Hartford to potentially conflicting standards of conduct. *Home Ins. Co. v. Service America Corp.,* 654 F.Supp. 157, 159 (N.D.Ill.1987). It is a basic policy underlying Maryland's *lex loci contractus* rule that the obligations of contracting parties should not vary according to the forum in which those obligations are adjudicated.

(Slip op. at 4–5).

These principles are equally applicable to the common law bad faith claims asserted by Lafarge against National Union in the amended complaint filed in this case. As in *Nationwide,* the bad faith claims at issue here are "inextricably intertwined" with Lafarge's breach of contract claim, and this Court will not under the circumstances here subject National Union to "potentially conflicting standards of conduct." Texas law must therefore also be applied to the common law bad faith claims asserted by Lafarge in this case.

■ In an oral opinion rendered during the *Nationwide* trial, this Court discussed at some length the elements which a plaintiff insured must prove in asserting bad faith claims under Texas law. (Tr. 3272–3279). The Court there granted the motion of Hartford and Travelers for judgment as a matter of law as to the bad faith claims asserted by Lafarge against them in that case. The principles enunciated at that time are fully applicable here. For the Lafarge plaintiffs to establish that defendant National Union violated its implied duty of good faith and fair dealing, the Lafarge plaintiffs have the burden under Texas law of showing: (1) the absence of a reasonable basis for denying or delaying payment of the benefits of the policy and (2) that the carrier knew or should

have known that there was not a reasonable basis for denying the claim or delaying payment of the claim. *Aranda v. Insurance Co. of No. Am.,* 748 S.W.2d 210, 213 (Tex.1988). The statutory duty of good faith under the Texas Insurance Code is virtually identical in all relevant respects to the common law duty of good faith which an insurer owes to its insured under Texas law. *See Lockett v. Prudential Ins. Co.,* 870 F.Supp. 735, 741 (W.D.Tex.1994).

In the *Lockett* case, United States District Judge Biery of the Western District of Texas spelled out in some detail the principles to be applied under Texas law when a court considers the viability of a claim that an insurance company violated the duty of good faith and fair dealing owed by it to its insured. This Court will here rely on the comprehensive and cogent discussion of the Texas law on this point, set forth in the *Lockett* case. 870 F.Supp. at 740–41.

■ A court facing the issue in question is required under Texas law to make an objective determination of whether a reasonable insurer under similar circumstances would have delayed or denied the claimant's benefits. *Id.* at 740 (citing *National Union Fire Ins. Co. v. Dominguez,* 873 S.W.2d 373, 376 (Tex.1994)). The absence of a reasonable basis must be judged by the facts which the insurer had at the time it denied the claim. *Id.* (citing *Viles v. Security Nat'l Ins. Co.,* 788 S.W.2d 566, 567 (Tex.1990)). Mere non-payment of a claim and the exercise by the insurer of its right to litigate before a jury the merits or demerits of the underlying contract claim is not in and of itself bad faith. *Id.* (citing *Aranda,* 748 S.W.2d at 213). The Court must therefore distinguish between the insurer's liability under the contract of insurance and the insurer's liability for bad faith. *Id.* (citing *Lyons v. Millers Cas. Ins. Co.,* 866 S.W.2d 597, 599 (Tex.1993)). Even if the insurer's basis for denying or delaying payment of a claim is erroneous, the insurer is not liable for the tort of bad faith. *Id.* The vital fact to be proved by a plaintiff is "the complete absence" of a reasonable basis for the denial of a claim, delay in payment or a failure to investigate. *Id.* (citing *Arnold v. National County Mut. Fire Ins. Co.,* 725

S.W.2d 165, 167 (Tex.1987)). The level of conduct required for proof of bad faith is not found when the evidence indicates that a *bona fide* dispute existed as to the insurer's liability. *Id.* (citing *Transportation Ins. Co. v. Moriel,* 879 S.W.2d 10, 18 (Tex.1994)). Nor can bad faith be established if the insurer was "incorrect" about the proper construction of the policy or the factual basis for its denial of the claim. *Id.* If the facts demonstrate as a matter of law that the insurer possessed evidence reasonably showing that the insured's contract claim might not be valid, the bad faith action is not viable because the opposite of the vital fact has been conclusively proved. *Id.* at 740–41; *see also Moriel,* 879 S.W.2d at 17–18.

These principles will be applied by the Court in this case.

### (c)

### *Discussion*

■ After hearing argument and after reviewing the parties' memoranda and the applicable cases, this Court has concluded that National Union's motion for summary judgment on the bad faith issues must be granted both as to plaintiffs' claim asserted under the Texas Insurance Code and plaintiffs' claim asserted under Texas common law. The plaintiffs have not, as a matter of law, met their burden as to either aspect of the test which must be satisfied. The proof relied upon fails as a matter of law to establish the complete absence of a reasonable basis for National Union's delay in failing to contribute to the Lone Star settlement. Evidence of record establishes that National Union did not act without a reasonable basis in denying or delaying, in view of the Lone Star settlement, the payment of benefits to Lafarge under the provisions of its indemnity policy. Evidence of record further establishes that National Union did not know that there was no reasonable basis for denying the claim or delaying payment of the claim. Nor should it have known under all the circumstances here that no reasonable basis existed for denying Lafarge's demand for payment.

That National Union's counsel did not immediately respond to each and every one of

the letters received from Lafarge's attorneys during the spring and summer of 1995 hardly constitutes bad faith. In some instances, there were written responses to Lafarge's letters while in others National Union's attorneys orally responded. During this period of time, National Union was a party to the *Nationwide* case which was at the time being actively litigated in preparation for an October trial. In a number of instances, the position of National Union in opposing Lafarge's demands was made clear by the filing of pleadings and memoranda in the *Nationwide* case. The Court is satisfied on the record here that National Union responded with reasonable promptness to the many communications received from Lafarge. Even though National Union's denial of coverage has now been determined to have been incorrect, this Court cannot conclude that there was a complete absence of a reasonable basis for the position taken.

This was certainly not a case in which an insurer like National Union could immediately determine whether its indemnity policy obligated it to pay a large portion of the proposed settlement. Many difficult questions had to be answered, including first and foremost whether the 1989–90 National Union policy had in fact been triggered. Before responding, National Union was also faced with the question whether the settlement proposal was a reasonable one under all the circumstances pertaining to the underlying *Lone Star* litigation, with the question whether other insurers were contributing their fair share of the settlement and with the question whether, if National Union agreed that there was coverage, Lafarge had allocated to it a fair and reasonable portion of the settlement amount. That there was delay on the part of National Union in answering these questions is certainly understandable. The massive records in both the *Lone Star* case and the *Nationwide* case demonstrate the complexity of the disputes between the Lafarge parties and their insurers concerning the indemnity obligations of each insurer.

Certainly, the circumstances here were unique and without precedent. There were primary insurers, excess and umbrella insurers and fronting insurers. Two different countries were involved. Some of the insurance policies covered Lafarge Corporation, a Maryland entity, and others covered Lafarge Canada Inc., a Canadian entity. Texas law was controlling as to some of the policies and Canadian law was applicable to others. Many coverage years were involved, and numerous different indemnity insurers had provided different types of coverage for different periods. It is apparent that a myriad of questions had to be addressed and resolved before National Union could be in a position to reasonably know whether it had an obligation under its indemnity policy to contribute to the settlement and, if so, in what proportion. Some of the key coverage rulings in the *Nationwide* case had not been made at the time that settlement of the *Lone Star* litigation was reached. Indeed, many important rulings were not made until the actual trial of the *Nationwide* case in the fall of 1995. Under all of these circumstances, it was hardly surprising that representatives of National Union did not during the summer of 1995 immediately agree to pay the $4,865,000 demanded by Lafarge or any lesser amount. On June 16, National Union had requested from Lafarge a "walk-away" number which would finally end its participation in the *Nationwide* case. No such figure was ever provided.

Moreover, unwarranted positions taken by Lafarge were in part responsible for the failure of the parties to reach any agreement as to the portion of the settlement which National Union should reasonably pay. Although this Court had previously rejected a request that there be a 50–50 split of coverage amounts due between carriers insuring Lafarge Corporation and those insuring Lafarge Canada Inc., Lafarge insisted in the allocation scheme presented to National Union that such a split must be made. In its proposed allocation scheme, Lafarge also ignored rulings made by this Court in the *Nationwide* case that the fairest and most equitable apportionment formula under the circumstances here was one whereby insurers' obligations would be apportioned on a *pro rata* basis according to the number of years during which each insurer had assumed the risk. In ignoring these rulings, Lafarge demanded from National Union

more than twice the amount which the Court has here determined would represent the latter's fair share of the $11.2 million settlement. Even though there were some six other insurers providing coverage during the years in question, Lafarge was demanding that National Union pay 43.4% of the settlement amount.

For these reasons, this Court is satisfied that the complex and unique circumstances present in this case would not permit any determination by a jury that National Union acted unreasonably and in bad faith. The Court concludes as a matter of law that National Union did not know, nor should it have known, that there was no reasonable basis for denying its obligation to contribute to the *Lone Star* settlement or for delaying payment of Lafarge's demand. The Court further concludes as a matter of law that National Union reasonably responded to pertinent communications from Lafarge. Accordingly, the motion for summary judgment of defendant National Union will be granted as to Counts II and III of the amended complaint.

### III

#### *Conclusion*

For all the reasons stated, the motion for summary judgment of the Lafarge plaintiffs as to Count I of the amended complaint will be granted. Judgment in the amount of $1,931,666 will be entered under Count I in favor of the Lafarge plaintiffs against defendant National Union.

The motion for summary judgment of defendant National Union will be denied as to Count I of the amended complaint and will be granted as to Counts II and III of the amended complaint. Judgment will be entered in favor of defendant National Union under Counts II and III of the amended complaint.

An appropriate Order will be entered by the Court.